**UNITED STATES of America, Appellee,**

v.

**Raymond M. KORFANT, Appellant.**

**No. 1278, Docket 85–1046.**

United States Court of Appeals,
Second Circuit.

Argued June 11, 1985.

Decided Aug. 26, 1985.

Philip J. Korey, Cleveland, Ohio (Thomas G. Longo, Cleveland, Ohio, of counsel), for appellant.

Marion L. Jetton, Dept. of Justice, Washington, D.C. (John J. Powers III, Charles F. Rule, Dept. of Justice, Washington, D.C., Melvin Lublinski, Martha E. Gifford, Robert Einstein, John J. Greene, Dept. of Justice, New York City, of counsel), for appellee.

Before FRIENDLY, OAKES, and WINTER, Circuit Judges.

PER CURIAM:

Raymond M. Korfant appeals from a ruling of the United States District Court for the District of Connecticut, Jose A. Cabranes, *Judge*, denying Korfant's motion to dismiss on ground of double jeopardy the Government's prosecution of him in the District of Connecticut for conspiracy to fix food prices. We affirm.

FACTS

Korfant was indicted by a grand jury in the District of Connecticut on August 15, 1984, for participating in a conspiracy to fix the prices of substantial quantities of grocery products and meat items, including eggs and turkeys, sold at retail to consumers in Connecticut and western Massachusetts, in violation of 15 U.S.C. § 1 (1982). At the root of Korfant's double jeopardy claim is his prior indictment and conviction in the United States District Court for the Northern District of Ohio, also on charges of conspiracy to fix food prices in violation of 15 U.S.C. § 1.

Korfant was for many years an executive of a Cleveland food retailer, Pick-N-Pay Supermarkets, Inc. ("Pick-N-Pay"), serving from 1975 to 1978 as vice president for buying and merchandising until being promoted in May 1978 to senior vice president for marketing and sales. In 1978, Pick-N-Pay, which until then had operated stores only in Ohio, merged with First National Supermarkets, Inc. ("First National"), a food retailer that, prior to the merger, had operated in six New England states and New York. The company resulting from the merger retained the name of First National Supermarkets, Inc., doing business in Ohio under the Pick-N-Pay name while operating under the "Finast" name in New England and New York.

On October 10, 1980, a federal grand jury impaneled in the Northern District of Ohio, Eastern Division, returned an indictment against First National and two other Cleveland food retailers, Fisher Foods, Inc., and Association of Stop-N-Shop Super Markets, and against Korfant and Richard J. Bogomolny, John Fazio, and Charles A. Rini, charging the defendants with two counts of conspiracy in restraint of trade in violation of 15 U.S.C. § 1. The indictment alleged, under Count 1, that from as early as 1976 until at least June 1977 the defendants had agreed to fix "the advertised prices and everyday shelf prices of grocery products and the advertised prices of some meat items" sold to consumers in Cuyahoga County, Ohio. Under Count 2, the indictment alleged that the defendants had made the same agreement described in Count 1, but over a time period beginning at least as early as August 1977 and extending until at least October 1978.

On February 19, 1982, all of the defendants, including Korfant, pleaded nolo contendere to the indictment, and Korfant was sentenced to six years of imprisonment and a fine of $200,000 but with sentence suspended on condition that he serve a five-

year probationary period; $125,000 of the fine was suspended, leaving $75,000.

On August 15, 1984, a federal grand jury sitting in the District of Connecticut returned a single count indictment against Korfant; Waldbaum, Inc. ("Waldbaum"), which operated a chain of supermarkets in Connecticut and Massachusetts; and Kenneth Abrahams, then a vice president of Waldbaum and president of its Food Mart Division. The indictment charged Korfant, Waldbaum, and Abrahams with conspiring, in violation of 15 U.S.C. § 1, to fix grocery product and meat item prices, including those of eggs and Thanksgiving turkeys, in Connecticut and western Massachusetts during a period beginning at least as early as the fall of 1978 and continuing until late 1980.

In response to the indictment in Connecticut, Korfant filed a motion in the district court on October 9, 1984, claiming that, in light of his Ohio prosecution and conviction, prosecution in Connecticut is barred by the double jeopardy clause of the Fifth Amendment and should therefore be dismissed. An evidentiary hearing on the motion followed, and on January 31, 1985, 612 F.Supp. 1307, the district court filed its ruling denying Korfant's motion to dismiss.[1]

## DISCUSSION

 In determining the merits of double jeopardy claims arising in the context of successive conspiracy prosecutions, this court has identified a number of factors as relevant to the task of individuating conspiracies. Among these factors are (1) the criminal offenses charged in successive indictments; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and

(8) the degree of interdependence between alleged distinct conspiracies. See, e.g., United States v. DeFillipo, 590 F.2d 1228, 1234–35 (2d Cir.), cert. denied, 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979); United States v. Papa, 533 F.2d 815, 821–22 (2d Cir.), cert. denied, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); United States v. Mallah, 503 F.2d 971, 985–86 (2d Cir.1974), cert. denied, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). By resort to an array of indicia, a court may address the merits of a double jeopardy claim in light of the totality of circumstances presented by a particular conspiracy charge—an apt and well-accepted approach given the nature of the crime of conspiracy, "that darling of the modern prosecutor's nursery." United States v. Cepeda, 768 F.2d 1515 (2d Cir.1985) (quoting Harrison v. United States, 7 F.2d 259, 263 (2d Cir. 1925)). Here, after properly conducting a "totality of circumstances" analysis of the facts, the district court determined, as between the price-fixing activities for which Korfant was convicted in Ohio and those alleged against him in Connecticut, that the absence of common overt acts, the disparate geographical locations of those acts, the absence of common actions and objectives, and the relative independence of those objectives supported the existence of a conspiracy in New England—if one is eventually found—distinct from the one in Ohio.

 We find no error in that determination. The crux of Korfant's argument on appeal is that the role of First National and the involvement of its employees in both Ohio and New England are sufficient to support the claim that the Ohio and the alleged New England conspiracies had a common objective, common coconspirators and overt acts, and were interdependent. Such an argument is unconvincing, how-

---

**1.** Waldbaum and Abrahams were both acquitted in the district court after a trial before a jury. Judgments of acquittal were entered by the court on March 25, 1985. We note that, but for the existence of an allegation in the Government's indictment that other, unnamed cocon-

spirators exist, this appeal might conceivably have been dismissed as moot. We assume that the Government continues to oppose Korfant's appeal because it believes it can prove the conspiracy charge against him notwithstanding the acquittal of Waldbaum and Abrahams.

ever, because Korfant does not dispute the district court's finding that, beyond First National and its employees, no other actor participated in both the Ohio and the New England activities. The participation of a single common actor in what are allegedly two sets of conspiratorial activities does not establish the existence of a single conspiracy, *Kotteakos v. United States*, 328 U.S. 750, 754–55, 66 S.Ct. 1239, 1342–43, 90 L.Ed. 1557 (1946); *Papa*, 533 F.2d at 822. This is true even where the common actor is alleged to have directed both sets of activities. *Id.*

█ Nor is Korfant's argument made stronger by his implicit claim that the participation of several First National executives in price-fixing activities in both Ohio and New England sufficiently broadens the overlap of coconspirators, and therefore actors, to create one conspiracy. In making such a claim, Korfant confuses the concept of actor relevant to determining criminal liability for conspiracy with that relevant to the issue at hand, the individuation of conspiracy. Korfant and the other defendants are charged with violating 15 U.S.C. § 1, which, as the district court noted, prohibits price-fixing among *competitors*. The key to establishing the identity as well as the existence of a conspiracy to fix prices in Ohio or New England is not an agreement among First National employees to act in concert but rather an agreement among First National and its retailing competitors to do so. *See Copperweld Corp. v. Independence Tube Corp.*, —— U.S. ——, ——, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984).

Finally, perhaps conclusively, the district court's determination that the Ohio and New England activities constitute distinct conspiracies is supported by the fact that the success or failure of an agreement to fix prices in New England would have been independent of a corresponding success or failure in Ohio. Assuming that First National did establish and attempt to execute an overall plan to fix prices in each of its regional markets, success in each depended upon its ability to achieve agreements with two distinct sets of competitors and upon

the response of two distinct consumer markets to the implementation of such agreements. Such functional independence reflects two conspiracies, not one, and Korfant's prosecution in Connecticut is therefore not barred, under the double jeopardy clause, by his conviction in Ohio.

Affirmed.