**UNITED STATES of America, Appellee,**

v.

**Thomas H. GANNON, Jr., Defendant–Appellant.**

**No. 973, Docket 91–1560.**

United States Court of Appeals, Second Circuit.

Argued Feb. 7, 1992.

Decided June 10, 1992.

———

Joseph W. Ryan, Jr., Uniondale, N.Y. (Irving A. Cohn, Judith Hepworth, Joseph W. Ryan, Jr., P.C., of counsel), for defendant-appellant.

James W. Lowe, U.S. Dept. of Justice, Washington, D.C. (James F. Rill, Asst. Atty. Gen., Charles A. James, Deputy Asst. Atty. Gen., Robert B. Nicholson, John J. Powers, III, U.S. Dept. of Justice, Washington, D.C., Charles V. Reilly, Edward Friedman, Patricia Howland, U.S. Dept. of Justice, N.Y. City, Andrew J. Maloney, U.S. Atty. E.D.N.Y. New York City, of counsel), for appellee.

Before: OAKES, Chief Judge, CARDAMONE and PIERCE, Circuit Judges.

OAKES, Chief Judge:

This appeal involves a question under the Double Jeopardy Clause. The government seeks to prosecute the appellant, Thomas H. Gannon, Jr., for perjury in denying certain bid-rigging allegations before a grand jury to which he was summoned after he and his company were acquitted by a jury in a previous bid-rigging conspiracy indictment. In the previous indictment, it was alleged that he and other road paving contractors conspired to rig bids to obtain slurry seal road paving work awarded by the Village of Pelham Manor, New York, and the Town of Brookhaven, New York. It alleged that Gannon and his company had agreed with the other contractors to submit "accommodation bids" that would facilitate one other contractor (Lansdell) in obtaining work let by the Village of Pelham Manor,

and that in return Gannon would win the work of the Town of Brookhaven through similar accommodation bids by the other contractors. At trial, the prosecution sought to prove that Gannon and the other contractors were trying to keep Lansdell out of Suffolk County. In the course of the trial, evidence was introduced to the effect that the contractors, including Gannon, divided up the six maintenance districts of Suffolk County. This evidence was objected to by Gannon but it was admitted as evidence of a larger conspiracy and to show Gannon's knowledge and intent. Admitted into evidence was a government-compiled summary of bids submitted to Suffolk County for slurry seal work let by the Suffolk County Department of Highways.

Following the verdict of acquittal in reference to the Brookhaven–Pelham Manor conspiracy, Gannon was summoned before a grand jury and asked questions relative to Suffolk County highway bid rigging. His denial of having had conversations or attending meetings regarding that bid rigging led to the instant perjury indictment.

In this interlocutory appeal from denial of a motion to dismiss the perjury indictment, *see Abney v. United States*, 431 U.S. 651, 662, 97 S.Ct. 2034, 2041, 52 L.Ed.2d 651 (1977), Gannon relies upon the Double Jeopardy Clause and the doctrine of collateral estoppel, principally citing *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), as explicated in *United States v. Calderone*, 917 F.2d 717 (2d Cir. 1990), *vacated and remanded*, —— U.S. ——, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992), as well as *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The government, on the other hand, relies principally on *Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990), also as explicated in *Calderone*, 917 F.2d at 724 (Newman, J., concurring) and as further elaborated upon recently by *United States v. Felix*, —— U.S. ——, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992). While we think the question closer than the government makes it out to be, on balance we believe the teaching of the cases above mentioned requires us to affirm.

## I. FACTS

In the 1970s and 1980s, Gannon and his company operated a road paving and highway repair business located in Coram in Suffolk County, eastern Long Island, which is denominated area 2 of the six different Suffolk County Maintenance Districts, and is located on the north shore of the island. Gannon's company was also favorably located to area 5, which encompasses Northport. Location is significant in the business because the closer the highway to be repaved is to the business operations, the less trucking and other expenses that may be involved. Proximity to the worksite, of course, is not the only factor which enters into the determination of costs. As came out in Gannon's testimony at his Pelham Manor/Brookhaven trial, among the other factors are: population density, since prior to commencing repaving all residents must be notified and alternate parking places found for them; road conditions; cost of labor and supplies, including meals and lodging, traffic time, tools, etc.; and availability of water for slurry seal operations. In the Pelham Manor/Brookhaven case, Gannon's testimony effectively substantiated the proposition that he could bid lower than other bidders because of his proximity to the Town of Brookhaven, whereas he would have to bid higher, say, in the Village of Pelham Manor.

The prosecution in the Pelham Manor/Brookhaven conspiracy case sought to prove, through the testimony of Robert Lansdell, president of the Lansdell Company, Inc., and its Long Island manager, Eugene Martino, that Lansdell, Gannon, Ascon Distributing Corp., and Bimasco, Inc. submitted rigged bids so as to let Lansdell win work let by the Village of Pelham Manor, while Gannon would win work let by the Town of Brookhaven. The prosecution also sought to prove the existence of a larger conspiracy—that Gannon and the principals of Ascon and Bimasco had attempted to keep Lansdell, a larger east coast contractor, out of Suffolk County by facilitating his bidding efforts at Pelham Manor. The government pretrial brief indi-

cated that the conspiracy, to which Lansdell and Martino would testify, involved "dividing up maintenance districts on the Suffolk County bid." According to the government, the participating contractors agreed in advance which company would be the low bidder in each area. Pursuant to the bidding scheme, the government alleged that Ascon proposed that Lansdell be allocated Pelham Manor in Westchester County in return for agreeing not to compete for slurry seal work on Long Island. Subsequently, the government alleged that Lansdell and Gannon made arrangements to ensure that Lansdell's bid would be lower than Gannon's for the Pelham Manor work.

When the government, during the trial, sought to elicit its proof of a broader conspiracy from the witness Lansdell, Gannon objected on the ground that the prosecution was offering proof of other crimes not charged. The prosecution successfully argued, however, that the proof was offered as "evidence of a larger conspiracy [of] which Pelham Manor–Brookhaven was a part," and to show Gannon's knowledge and intent. The defense countered that the alleged Suffolk County conspiracy commenced a year later and was independent of the alleged Pelham Manor/Brookhaven conspiracy. The district court ruled in favor of the prosecution that the evidence of a larger conspiracy could be admitted under Fed.R.Evid. 404(b) as showing Gannon's intent and motive. Lansdell thus testified, over objection, to a meeting relating to the Suffolk County bidding system and the division of the six Suffolk County maintenance district awards through a bid-rigging scheme. In support of its broader conspiracy theory, the government submitted its Exhibit 58, a five-page summary of bids covering the years 1976–85 for each of the six maintenance districts. The exhibit detailed Lansdell's successful bids in areas 3, 4 and 5 in December 1977 bids, and in areas 3 and 4 from 1979–82, and area 4 from 1983–84, and Gannon's successful bids in areas 5 and 6, commencing in 1979 and continuing through 1985. On the basis of this evidence, the prosecution claimed that there was "sufficient evidence for the jury to conclude that this was all part of one larger conspiracy."

On cross-examination of Gannon, the government elicited from him denials about not just the Town of Brookhaven and Village of Pelham Manor bid-rigging agreements, but as to a 1979 meeting with Lansdell and the Bimasco and Ascon principals to divide up Suffolk County bids. Gannon also denied attending subsequent meetings in subsequent years.

In summation, the government sought to place the alleged Brookhaven/Pelham Manor conspiracy within the context of the larger conspiracy. The government argued that since Gannon had a half a million dollars a year's worth of work from the Town of Brookhaven, had he lost that to Lansdell he would have had to venture into the exclusive havens of Ascon and Bimasco in Smithtown, Islip and Babylon, hence, the call from the Ascon principal to Lansdell, "If you leave us alone in eastern Long Island you can have Pelham Manor." The government further referred to "the patterns on the Suffolk County bid" and told the jury to "see how the patterns of bidding on that Suffolk County bid changed dramatically" after the alleged meeting of January 1979. In short, the prosecution argued that the agreement to divide up the maintenance districts in Suffolk county grew out of the agreement to allocate Pelham Manor and Brookhaven.

The district court charged the jury that "there is only one issue in this case. Did the defendants enter into a conspiracy for the bidding of slurry seal work in the village of Pelham Manor and the town of Brookhaven?" As indicated above, the jury acquitted Gannon and his company. A month after the verdict of acquittal, however, Gannon was summoned by the grand jury, and, after a grant of immunity under 18 U.S.C. § 6002 (1988), he was questioned about a meeting with other road paving contractors—particularly Martino of Lansdell, Harry Streuli from Ascon, and Grant Hendricks from Bimasco—called for the purpose of dividing up the Suffolk County bid including the bids for road work in certain towns on Long Island including Ba-

bylon, Smithtown and Islip. The grand jury indicted him for his negative answers in reference to his participation in discussions, conversations, and meetings about the bids, particularly in years following 1979, and also for saying he never told any other contractor what he intended to bid on. Gannon appeals from the district court's adverse ruling on his double jeopardy/collateral estoppel argument.

## II. DISCUSSION

Since *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), the Court has held that the Double Jeopardy Clause of the Fifth Amendment prohibits successive prosecutions for the same criminal act or transaction under two criminal statutes whenever the offense charged in the subsequent prosecution does not "require[ ] proof of a fact which the other does not." In *Illinois v. Vitale*, 447 U.S. 410, 419–21, 100 S.Ct. 2260, 2266–67, 65 L.Ed.2d 228 (1980), the Court suggested that even if the *Blockburger* test did not bar a successive prosecution, the second prosecution would be barred if the prosecution sought to establish an essential element of the second crime by proving the conduct for which the defendant was convicted in the first prosecution. In *Grady v. Corbin*, 110 S.Ct. at 2087, the Court adopted the suggestion from *Vitale*, holding that "the Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted." In so doing, the Court made clear that "The critical inquiry is what conduct the State will prove, not the evidence the State will use to prove that conduct." *Id.* at 2093. Citing *Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990), the Court noted that the presentation of specific evidence in one trial does not forever prevent the government from introducing that same evidence in a subsequent proceeding. The Court further elaborated that the *Blockburger* test is not a "same evidence" test since it has "nothing to do

with the *evidence* presented at trial," but is concerned "solely with the statutory elements of the offenses charged." *Grady*, 110 S.Ct. at 2093 n. 12. A prosecution, however, "cannot avoid the dictates of the Double Jeopardy Clause merely by altering in successive prosecutions the evidence offered to prove the same conduct." *Id.* at 2093. In *Grady*, the state had admitted that it would prove the entirety of the conduct for which Corbin was convicted—driving while intoxicated and failing to keep right of the median—to establish "essential elements" of the homicide and assault offenses; therefore, the Double Jeopardy Clause barred the second prosecution.

In *Calderone*, a majority of the Second Circuit panel held that *Grady* barred reprosecution of Calderone and Catalano for activities related to heroin selling following acquittal in a previous conspiracy prosecution, which involved a larger conspiracy in addition to the heroin-selling activities alleged in the second prosecution. 917 F.2d at 722. The panel majority thought that the *Grady* test was intended to guide Double Jeopardy analysis in all cases involving successive prosecutions, not just in the limited circumstance involving successive prosecution of separate crimes arising from a single event. *Calderone*, 917 F.2d at 721. Consequently, it was of the view that to the extent that *United States v. Korfant*, 771 F.2d 660 (2d Cir.1985) (per curiam), and other Second Circuit cases specified a balancing approach to determining whether successive prosecutions for overlapping conspiracies were barred—instead of the *Grady* "same conduct" test—these cases "were no longer good law." *Calderone*, 917 F.2d at 721. The panel majority opinion concluded that Grady's "same conduct" test barred prosecution not only of the conspiracy count but also of substantive telephone and heroin distribution counts. The panel majority reasoned that even though the defendants were not charged with the substantive crimes in the case previously prosecuted, they were prosecuted for the conduct that supported those offenses, which, pursuant to *Grady*, was sufficient to bar reprosecution. *Id.* at 722.

Judge Newman's concurring opinion pointed out three distinctions between *Grady* and *Calderone,* none of which Judge Newman felt made *Grady* inapplicable: (1) *Grady* presented the issue whether the Double Jeopardy Clause barred prosecution under one statute after prosecution under a different statute; (2) *Grady* involved successive prosecutions of offenses arising out of a single occurrence whereas *Calderone* was concerned with continuing conduct; and (3) *Grady* did not involve "compound-complex crimes," a distinction accepted by the Third Circuit in *United States v. Pungitore,* 910 F.2d 1084, 1109–11 (3rd Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991). *Calderone,* 917 F.2d at 722–23.

Judge Newman went on to say that he felt the word "element" in the *Grady* majority opinion was chosen with care and must be read with equal care to prevent the *Grady*-test from becoming a "same evidence test." *Calderone,* 917 F.2d at 723–24. Judge Newman suggested that the *Grady* "element" component "means barring the second prosecution only when the conduct previously prosecuted is to be used to 'establish' the element of the second crime," which Judge Newman thought "must mean 'constitute the entirety of' the element." *Calderone,* 917 F.2d at 724. He went on to point out that the majority opinion in *Grady* declined to overrule *Dowling,* even though the dissenters thought that the majority opinion had done so. *Calderone,* 917 F.2d at 724, *see also Grady,* 110 S.Ct. at 2095–96 (O'Connor, *J.,* dissenting) & 2102 (Scalia, *J.,* dissenting).[1] Judge Newman then sought to explicate *Grady*'s reference to "conduct that constitutes an offense for which the defendant has already been prosecuted," 110 S.Ct. at 2087, while preserving *Dowling.* He concluded that the *Grady*-test bars a second prosecution "whenever the defendant is at risk that the *entirety* of an element of an offense in a pending prosecution might be established by conduct constituting the *entirety* of a previously prosecuted offense (as in *Grady* ), or the *entirety* of an element of such an offense, or the *entirety* of a distinct component of such an offense...." *Calderone,* 917 F.2d at 725 (emphasis added). Under Judge Newman's analysis, *Grady* would not bar Gannon's prosecution for perjury relative to the Long Island conspiracy (the Suffolk County bid rigging), since the acquittal related only to the Pelham Manor/Brookhaven conspiracy—a conspiracy which constituted neither the entirety of an element nor the entirety of a distinct component of the perjury charge.

A case decided by the Supreme Court a few weeks after the Gannon case was argued sheds more light on the meaning of *Grady* and its application to the instant case. In *United States v. Felix,* the Court—following *United States v. Bayer,* 331 U.S. 532, 542–43, 67 S.Ct. 1394, 1399, 91 L.Ed. 1654 (1947), and *Pinkerton v. United States,* 328 U.S. 640, 643, 66 S.Ct. 1180, 1181, 90 L.Ed. 1489 (1946)—held that a substantive crime and a conspiracy to commit that crime are not "the same offense" for Double Jeopardy purposes even if they are based on the same underlying incidents. 112 S.Ct. at 1384. The Court noted that *Grady* had not questioned this established doctrine; the Court further noted that lesser included offense-type analyses—such as the *Grady* and *Blockburger* tests—are "much less helpful in analyzing subsequent conspiracy prosecutions that are supported by previously prosecuted overt acts." *Felix,* 112 S.Ct. at 1385.

The *Felix* Court elaborated on the Double Jeopardy analysis in two ways that bear on the case at hand. First, it pointed out that evidence of drug transactions in which Felix had participated in Oklahoma was first admitted against Felix for Fed. R.Evid. 404(b) purposes at the Missouri trial, the first prosecution, and that Felix was subsequently prosecuted for those same

---

1. In *Dowling,* the defendant was prosecuted successively for two separate robberies. Following acquittal for the first robbery, the so called Henry robbery, the defendant was prosecuted for a second robbery. At the second trial, the prosecution introduced evidence of the defendant's conduct in the Henry robbery to establish his identity as the perpetrator of the second robbery. The Court held that this use of rule 404(b) evidence did not violate the Double Jeopardy Clause. *Dowling,* 493 U.S. at 349–50, 110 S.Ct. at 672–73.

Oklahoma drug transactions. *Felix*, 112 S.Ct. at 1383 n. 3. The Court specifically declined to adopt "a rule that the admission of evidence concerning a crime under Rule 404(b) constitutes prosecution for that crime," pointing out that under such rule the Double Jeopardy Clause would have barred the subsequent admission of the Henry evidence, thus, overturning *Dowling. Felix*, 112 S.Ct. at 1383 n. 3.

Second, the Court referred in depth to our *Calderone* case, pointing out that the *Calderone* court decided that the conduct at issue in a conspiracy prosecution is not the agreement itself but the conduct from which the government asks the jury to infer that there was an agreement, and making specific mention of Judge Newman's conclusion that *Grady* bars a subsequent prosecution only when previously prosecuted conduct will be used to establish the entirety of an element of the second crime. *Felix*, 112 S.Ct. at 1385. The Court went on to say, after recounting these views, that "[i]t appears that while *Grady* eschewed a 'same evidence' test and *Garrett [v. United States*, 471 U.S. 773, 790, 105 S.Ct. 2407, 2417, 85 L.Ed.2d 764 (1985) ] rejected a 'single transaction' test, the line between those tests and the 'same conduct' language of *Grady* is not easy to discern." *Felix*, 112 S.Ct. at 1385. The Court, however, declined to become enmeshed "in such subtleties," staying with the rule that a conspiracy to commit a crime is a separate offense from the crime itself. *Id.*

Applying the teachings of this line of cases to our present situation, Gannon's perjury charges are not barred by the previous acquittal. None of the perjury charges relate to the offense for which he was first prosecuted, namely, a conspiracy to rig bidding for Pelham Manor and Brookhaven. Rather, the perjury charges relate to bid rigging for the Suffolk County highway districts and possibly as to certain other Long Island municipalities. True, evidence as to the Suffolk County conspiracy was admitted under rule 404(b) in the Pelham Manor/Brookhaven case; Government exhibit 58, recounted above, specifically involved that Suffolk County highway district bidding. The *Felix* footnote referred

to above, however, specifically says that admission of rule 404(b) evidence does not constitute a prosecution within the meaning of the cases. 112 S.Ct. at 1383 n. 3. Beyond that, neither *Grady* nor *Felix* would support the proposition that acquittal of the Pelham Manor/Brookhaven conspiracy *necessarily* amounted to an acquittal as to the Suffolk County conspiracy. *See also United States v. Citron*, 853 F.2d 1055, 1058 (2d Cir.1988) (government collaterally estopped from relitigating issues necessarily decided in favor of the defendant by a previous final judgment). It may be that the Suffolk bid-rigging conspiracy grew out of the Pelham Manor/Brookhaven conspiracy—in the sense that by giving Lansdell the bid for Pelham Manor it was hoped by the others to keep Lansdell out of Long Island—but this would not *necessarily* involve an agreement to rig the bids in Suffolk County involving the other paving contractors, Ascon and Bimasco. And it is the conversations relating to Suffolk County, which took place between the Ascon and Bimasco principals, Streuli and Hendricks, as to which Gannon was asked questions by the grand jury and to which he is alleged to have given false answers. In no sense would *Grady*, as explicated in *Felix* and *Calderone*, bar this prosecution.

Affirmed.