**UNITED STATES of America,**
**Appellee,**

v.

**Andy E. MASLIN, Defendant–**
**Appellant.**

**Docket No. 02–1648.**

United States Court of Appeals,
Second Circuit.

Argued: Sept. 12, 2003.

Decided: Jan. 13, 2004.

Barbara D. Cottrell, Senior Litigation Counsel, Albany, New York on behalf of Glenn T. Suddaby, United States Attorney, Northern District of New York (Grant C. Jaquith, Assistant United States Attorney, on the brief), for Appellee.

Bruce R. Bryan, Syracuse, New York, for Defendant–Appellant.

Before: CABRANES and PARKER, Circuit Judges, and RAKOFF, District Judge.*

RAKOFF, District Judge:

On May 10, 1999, a federal grand jury in Binghamton, New York returned a superseding indictment that charged Andy E. Maslin and 27 others with a single count of conspiracy to distribute marijuana. The "bare-bones" indictment charged that:

Between in and about January of 1997, through and including up to the date of this Indictment, in the Northern District of New York and elsewhere, the defendants [list of names] did unlawfully, knowingly and intentionally combine, conspire, confederate and agree with each other and with others, both known

and unknown to the grand jury, for the purpose of knowingly and intentionally possessing with intent to distribute and distributing a controlled substance, to wit, marihuana [sic], a Schedule I controlled substance, in violation of Title 21, U.S.C., Section 841(a)(1).

Of the 28 named defendants, only Maslin went to trial. In his opening statement, the prosecutor explained that what was charged was a far-flung conspiracy involving the distribution of high grade marijuana obtained from the Indian reservation area in northern New York and Canada and lower grade marijuana obtained from other locales throughout the United States and from Mexico. As for Maslin, his role in the conspiracy was that of a marijuana "broker," who both bought and sold marijuana and made a profit from the difference in price:

The evidence will show that Mr. Maslin in that broker capacity also would get people together to—the buyer and seller. . . .

What did Mr. Maslin get out it? We are going to prove Mr. Maslin got a broker's fee. He got money out of it. . . .

He did it to make money and we will prove to you that he made very good money selling marijuana. Sometimes upwards of $1,000 per pound. So that he would obtain the marijuana from the northern section of New York, from the Indian reservations, marijuana called hydro. . . .

He would then turn around and sell that marijuana to whom? To people like Mr. Ken Howe, Junior. People like Mr. Daniel Pryor. Other people.

Mr. Maslin also, in addition to providing high grade quality marijuana to people,

* The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

would purchase middle and low grade marijuana. From where? From Mr. Ken Howe, Junior. Where did Mr. Ken Howe, Junior get the marijuana? From Texas. From across the border down into the Mexico area.

The Government said it would prove all this in various ways:

> So you're not only going to hear it on tape, you're not only going to hear it from surveillance teams who made observations, you're not only going to hear it from other marijuana dealers, conspirators in this case, Mr. Howe and Mr. Pyror [sic], you're going to hear it from Mr. Maslin's own words.

The reference to Maslin's "own words" was to statements he had made to FBI Special Agent John Bokal in pre-trial proffer sessions that, under the terms of the unusual proffer agreement then in use in the Binghamton Division of the United States Attorney's Office, were admissible against him at trial even if he did not take the stand or otherwise "open the door." Previewing Agent Bokal's testimony, the prosecutor stated:

> Agent Bokal will tell you how Mr. Maslin told him about the hydro, hydroponic marijuana. Where he got it from. Where he was selling it. For how much.

The trial itself lasted three days, with the Government's proof largely mirroring its opening statement. First, Agent Bokal testified to Maslin's statements, in which Maslin confessed in some detail to having procured from various co-conspirators (including Peter Clute, Al Jacobs, and Rocky Skidders) large quantities of marijuana coming from the north, as well as some small quantities of cocaine. For example:

> [Maslin] told me about an individual by the name of Al Jacobs and Mr. Maslin stated to me that he and Al Jacobs had transported thousands and thousands of pounds of marijuana that the two of

them had obtained from the Hells Angels in Canada and brought it to Cornwell Island. Mr. Maslin told me that some of the Hells Angels that Mr. Jacobs dealt with were identified as Hydro, Red Beard and possibly Red Horse. Mr. Maslin also admitted to me that an individual by the name of Rocky Skidders was also supplied marijuana by these individuals. Mr. Maslin also admitted to me that over the past three or four months he had been obtaining cocaine from an individual identified as Peter Clute. Mr. Maslin also admitted to me that he obtained marijuana from Mr. Clute. . . . Mr. Maslin told me that Mr. Clute had provided him with between 50 and 200 pounds of marijuana.

Next, a co-conspirator, Kenneth Howe, testified that Maslin supplied him with hydroponic marijuana that came "off the Indian reservation and across Canada." Howe also testified about a March 14, 1999 transaction in which Maslin brought hydroponic marijuana to a diner for distribution to Howe, who then give it to one Jack Godoy to resell.

A second co-conspirator, Daniel Pryor, similarly testified to purchasing hydroponic marijuana from Maslin on a number of occasions, some of it coming "[f]rom the [Indian] reservation up there in Massena."

Finally, a surveillance officer, Alvin Olson, testified that his investigation had targeted marijuana sales at "the Mohawk Indian reservation" in Massena, New York and that he had overheard Maslin purchasing hydroponic marijuana. Wiretapped conversations evidenced Maslin's involvement in the procurement of such marijuana.

These witnesses and tapes also provided information about Maslin's distribution of the hydroponic marijuana to various locales as well as his purchase and distribu-

tion of lower grade marijuana originating in other geographic regions. Overall, the proof portrayed a loosely-knit operation whose common connection was Maslin's role as broker.

On summation, the Government once again described a generalized marijuana conspiracy, with Maslin, the broker, purchasing hydroponic marijuana from the Indian reservation in the "north country" and reselling it in places like New York City, while purchasing low-grade marijuana elsewhere to be resold in the north country:

> They're being charged with being members of a conspiracy. Conspiracy to do what? Make money, sell and distributing, providing marijuana and in doing that, they have common goals and they have things that they do together to achieve those common goals. And where is that shown in the evidence? It's shown when Mr. Maslin and Mr. Howe are discussing about providing marijuana, hydro marijuana to New York City.

> \*    \*    \*    \*    \*    \*

> Mr. Howe provides Mr. Maslin with middle grade, low grade marijuana. For what purpose? So that he and Mr. Maslin can make money. Mr. Maslin sells that low to middle grade marijuana up north in the north country. Vice versa. Mr. Maslin has access to hydroponic marijuana. High grade marijuana. They're making deals on both ends of the spectrum. On both sides of high grade marijuana, low grade marijuana.

After receiving the district court's instructions setting forth the elements of conspiracy in the same "bare-bones" manner as the indictment, the jury returned a verdict on March 9, 2000, convicting Maslin of the single count of conspiracy to distribute marijuana. Maslin appealed his conviction on the ground, *inter alia*, that the Government had actually proved multiple conspiracies rather than a single conspiracy, but the conviction was affirmed in a summary opinion that did not discuss this issue.

Meanwhile, very shortly after Maslin was first indicted in Binghamton, another federal grand jury in the Northern District of New York, this one in Albany, indicted him and four others on June 17, 1999 on another charge of narcotics conspiracy. As set forth in a superseding indictment eventually filed on February 22, 2001, the charge was that:

> From about 1995, up to and including on or about June 8, 1999 in the Northern District of New York and elsewhere, the defendants, JOHN R. SKIDDERS, a/k/a Rocky,[1] ANDY E. MASLIN, and STEVEN MARTIN, did knowingly and intentionally combine, conspire, confederate, and agree together with each other, Peter Clute, Paul C. Kennedy, and Sherry L. Kennedy, and with others known and unknown to the grand jury, to possess with intent to distribute and distribute cocaine, a Schedule II controlled substance, and marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Although the Albany indictment was only slightly more particularized than the indictment in the Binghamton case, the Albany indictment appeared to describe a conspiracy that was different from that described in the Binghamton indictment in three respects: (i) it began in 1995, rather

---

1. This was the same "Rocky Skidders" as to whose dealings with Maslin Agent Bokal had testified at the Binghamton trial, *see supra.*

than 1997; (ii) it involved cocaine as well as marijuana; and (iii) it involved different named defendants, with Maslin being the only defendant named in both indictments. On these bases, as well on the district court's understanding that "the two conspiracies operated in distinct geographical areas," *United States v. Maslin*, No. 1:99–CR–303, Memorandum Decision and Order at 9 (N.D.N.Y. Dec. 20, 2001), the district court denied a pretrial motion to dismiss the indictment on double jeopardy grounds.

In the four-day trial that followed, however, much of the proof mirrored the proof presented in the Binghamton case. Thus, Police Investigator Olson and Agent Bokal essentially repeated much of the testimony they had given in the Binghamton trial. Indeed, so far as co-conspirators Clute and Jacobs were concerned, Bokal gave testimony almost verbatim identical to that which he had given at the first trial:

Mr. Maslin told me that for the two or three months prior to his arrest, he had purchased approximately 3 to 4 ounces of cocaine from Mr. Clute. He also told me that he had purchased between 50 and 300 pounds of marijuana from Mr. Clute.

\* \* \* \* \* \*

Mr. Maslin told me that he and Al Jacobs were responsible for distributing thousands and thousands of pounds of marijuana. Mr. Maslin told me that Mr. Jacobs had a connection with the Hell's Angels in Canada and that he would make the arrangements for the deliveries. Mr. Maslin told me that he and Al Jacobs would smuggle between 40 and 100 pounds of marijuana per trip from Canada into Cornwall Island.

A different cooperating co-conspirator, Peter Clute, testified at the Albany trial than the co-conspirators, Howe and Pryor, who had testified in the Binghamton trial.

However, the basic conspiratorial outline set out in Clute's testimony did not substantively differ from that presented in the Binghamton trial, the gist of it being that during the years 1998–1999, Maslin, the broker, purchased from Clute and other intermediaries, for distribution elsewhere, large quantities of hydroponic marijuana obtained from the north.

Given the proof, the Government, on summation, essentially conceded that the conspiracy on which the jury was being asked to focus did not embrace the period 1995–1999 referenced in the indictment, but instead, "the time frame that we're dealing with in this case is approximately one year, from '98 to '99, ending on June 8th of 1999, when Peter Clute and the defendant were arrested."

The Government further admitted that the amount of cocaine, if at all, was trivial and not the main thrust of the Government's theory:

[T]he indictment charges that the entire conspiracy involved 5 or more kilograms of cocaine . . . .

But this defendant did not participate in the cocaine aspect of the conspiracy to that degree, and so that part of the indictment doesn't apply to the defendant, as indicated to you at the beginning of the case, and has been dismissed as to him at this point.

\* \* \* \* \* \*

The principal object of the conspiracy, of course, that the defendant's part of it, his participation with Peter Clute and Junior and Al, was the distribution of marijuana.

Further still, while the named defendants in the two cases were different, there was a substantial overlap of prominent co-conspirators in the two cases, such as Peter Clute, Al Jacobs, and Rocky Skid-

ders, each of whom, as already noted, were identified as primary sources of Maslin's marijuana in both cases.

Lastly, while the testimony and arguments in the Albany case focused primarily on the obtaining of hydroponic marijuana from the north, they did so by way of describing essentially the same operations that had formed that aspect of the conspiracy set forth in the Binghamton case. Moreover, even in the Albany case, Maslin was described as a broker who bought and sold marijuana "all over the United States."

On January 31, 2002, Maslin (who represented himself *pro se* at the second trial) was duly convicted of the single conspiracy charge against him. On February 8, 2002, following the adverse verdict, Maslin's stand-by counsel filed a request for reconsideration of the double jeopardy motion, but this was denied on April 29, 2002. On October 16, 2002, Maslin was sentenced to a term of 78 months, to run concurrently with Maslin's 60–month sentence from the first case. It is from the second conviction that the instant appeal is taken.

■ On appeal, we review the double jeopardy issue *de novo*. *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir.2003). Since the two conspiracies of which Maslin was convicted are identical in their legal elements, the question is whether they involve factually distinct conspiracies. *Id.* at 180; *United States v. Nersesian*, 824 F.2d 1294, 1319 (2d Cir.1987). In so determining, "no dominant factor or single touchstone determines" whether two conspiracies are the same. *United States v. Macchia*, 35 F.3d 662, 668 (2d Cir. 1994). In *United States v. Korfant*, 771 F.2d 660, 662 (2d Cir.1985), this Court suggested some factors that might typically be relevant—such as the similarity

of the criminal offenses charged in successive indictments, the overlap of participants, the overlap of time, the similarity of operation, the existence of common overt acts, the geographic scope of the alleged conspiracies or locations where overt acts occurred, common objectives, and the degree of interdependence between the alleged conspiracies. But the *Korfant* list is not exhaustive, and every case must be assessed on its own terms to determine whether or not, based on the entire record, the second prosecution is for the same or for a different crime than the first. *See Macchia*, 35 F.3d at 668.

■ Here, even if one focuses only on the *Korfant* factors, one must conclude that the two conspiracies, as they were actually presented at trial, were substantially the same. Thus, although the indictments purport to charge factually different conspiracies, the nominal differences of time, place, and scope were, as noted above, largely abandoned at trial. While the participants were somewhat different, Maslin's connections to Clute, Jacobs, and Skidders as his largest suppliers of hydroponic marijuana were prominently featured in both trials. As for time, by the end of the second trial, the Government had expressly abandoned any meaningful claim of different timing between the two conspiracies. As to operation, the two conspiracies, and especially Maslin's key role as broker, were largely identical in the two cases, as were the distribution chains of the valuable hydroponic marijuana from the north country. The overt acts, while not all identical, included many prominent ones, such as those described by Agent Bokal, that were identical down to their very description. The geographic scope, both generally (nationwide) and particularly (focused on the "north country")

was essentially the same.[2] Once the cocaine reference was effectively abandoned, the objectives were likewise identical. Finally, as to interdependence, since what was ultimately proven was one common conspiracy, this factor is irrelevant.

There are, moreover, several additional factors here, not directly addressed in *Korfant*, that further point toward a finding of double jeopardy. These include the fact that the Government, in its opening and closing arguments, presented both cases to the jury as broad conspiracies of an essentially identical nature; that the district judges in both cases made no effort to define the charged conspiracies beyond the bare elements; that the two essentially unimpeachable witnesses, Olson and Bokal, gave essentially identical testimony at both trials; that the most damning evidence—Maslin's own admissions—was identical at the two trials; and that a central focus of most of the co-conspirator testimony at both trials was the supply of hydroponic marijuana from Canada through the Indian reservation to Maslin, who then distributed it nationwide.

In the end, in the circumstances presented here, the Government cannot have it both ways. Having charged and proven in the Binghamton case a broad (and somewhat elastic) conspiracy embracing virtually the totality of Maslin's marijuana brokerage activities—and very prominently his brokerage activities involving hydroponic marijuana brought in from the north—it is hardly in a position to claim that the Albany case, alleged in equally

broad terms but focusing more exclusively on the north-originating hydroponic marijuana activity, is a separate conspiracy. Taken together, we are left with the firm conclusion that any alleged differences between the two charges, as those conspiracies were actually presented to the jury, pale in comparison with their substantial identity, and that Maslin was therefore twice put in jeopardy for the same offense.

Accordingly, we reverse Maslin's conviction.

---

**2.** Although the district court, in denying the double jeopardy motion prior to the Albany trial, stated that the conspiracy charged in the Binghamton case "centered in the Binghamton area" while that charged in the Albany case "centered in the [Indian reservation] area of Akwesasne, which straddles the border between the United States and Canada," in actuality, the proof at both trials, as noted

above, described a nationwide marijuana distribution system brokered by Maslin, with hydroponic marijuana being obtained from the north country and distributed elsewhere. That the Binghamton case included more proof about the additional sales of lower grade marijuana from the south does not make it a separate conspiracy.