**UNITED STATES of America**

v.

**Thomas McGOWAN and William Nulty, Defendants.**

**93 CR 386 (RJD).**

United States District Court, E.D. New York.

June 15, 1994.

Neil E. Ross, Asst. U.S. Atty., Eastern Dist. of N.Y., Brooklyn, NY, for U.S.

Peter J. Driscoll, Driscoll & Redlich, New York City, for defendant.

DEARIE, District Judge.

Defendant Thomas McGowan moves to dismiss Count One of the indictment on double jeopardy grounds. In addition, McGowan moves to dismiss Counts Two and Three of the indictment on the alternate grounds of double jeopardy or collateral estoppel.

The Court concludes that the Double Jeopardy Clause of the Fifth Amendment bars prosecution of the labor payoff conspiracy charged in Count One, but does not bar prosecution of the substantive offenses charged in Counts Two and Three. Further, those substantive offenses are not barred by collateral estoppel.

### MEMORANDUM AND ORDER

Accordingly, McGowan's Motion to Dismiss is granted as to Count One and denied as to Counts Two and Three.[1]

## I. FACTUAL BACKGROUND

### A. The Windows Case

In *United States v. Mangano*[2], popularly referred to as the *"Windows"* case, Thomas McGowan and fourteen other defendants were charged with monopolizing and corruptly controlling the window replacement industry in the New York City area through racketeering, extortion, mail fraud, and payoffs to union officials. The centerpiece of the *Windows* prosecution was a massive RICO conspiracy in which it was alleged that, for over a decade, members and associates of four organized crime families joined with corrupt union officials and window manufacturers and installers in a bid-rigging scheme that controlled the lucrative window replacement market in New York City. Numerous racketeering acts were charged, including a multitude of labor payoffs, acts of extortion, and instances of mail fraud. The primary—but by no means exclusive—focus of the *Win-*

*dows* trial was alleged bid-rigging on New York City Housing Authority ("NYCHA") windows. In the multi-count *Windows* case, McGowan, an official of Local 580 of the Architectural and Ornamental Workers Union ("Local 580"), was charged in Count One (Racketeering Conspiracy), Count Two (Racketeering), Count Three (Extortion Conspiracy), Count Four (Labor Payoff Conspiracy), Count Five (Mail Fraud Conspiracy), Counts 6–8 (Labor Payoffs), Counts 12–34 (Labor Payoffs), Count 65 (Labor Payoff), Count 67 (Labor Payoff), and Counts 68–69 (Mail Fraud). *Windows* Indictment.

At issue in this case is the scope of the labor payoff conspiracy charged in Count Four of the *Windows* indictment. Specifically, in that count McGowan was charged, along with fourteen named defendants and others, with participation in a broad decade-long conspiracy to receive illegal labor payoffs in connection with the window replacement industry in the New York metropolitan area. On October 18, 1991, after a six month jury trial over which this Court presided, defendants Benedetto Aloi, Dennis Delucia, and Venero Mangano were convicted on charges of conspiracy to commit extortion (Count 3) and extortion (Count 59). The jury acquitted on all remaining charges—including all charges of racketeering, labor payoffs and the related conspiracies.

### B. The McGowan Indictment

In Count One of the indictment in this case, McGowan, along with co-defendant William Nulty and others unnamed, is charged with a labor payoff conspiracy under the Taft–Hartley Act, 29 U.S.C. Section 186(b)(1) & (d)(2), in connection with the installation of windows for "Spring Creek," a privately built housing development in Brooklyn, New York. In his Motion to Dismiss, McGowan contends that the conduct charged in Count One of the *McGowan* indictment falls squarely within that charged in Count Four of the *Windows* indictment. Thus, he argues that his prior

---

1. The Court ruled prior to trial. This Memorandum and Order sets forth the Court's reasoning with respect to the issues presented. After a jury trial, McGowan was convicted on Counts Two and Three of the Indictment.

2. The case was originally named *United States v. Gigante*, 90 CR 446 (RJD).

acquittal in the *Windows* payoff conspiracy precludes his prosecution for his alleged involvement in the "Spring Creek" conspiracy.

In Counts Two and Three of the *McGowan* indictment, McGowan and co-defendant Nulty are charged with substantive violations of the Taft–Hartley Act. In his Motion to Dismiss, McGowan argues that double jeopardy principles and the doctrine of collateral estoppel bar the prosecution of these substantive violations.

## II. *DISCUSSION*

### A. *Count One*

The Double Jeopardy Clause of the Fifth Amendment states: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Amend. V, cl. 2. The Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal." *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977), (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969)). Determining what constitutes prosecution for the "same offense," however, can be a challenging and exacting task, particularly in the context of successive conspiracy prosecutions.

In recent years, this task has been further complicated because double jeopardy jurisprudence has been in a state of flux, particularly in cases where conspiracy charges are involved. In 1990, the United States Supreme Court announced the rule that "the Double Jeopardy clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted." *Grady v. Corbin*, 495 U.S. 508, 521, 110 S.Ct. 2084, 2093, 109 L.Ed.2d 548 (1990). This "same conduct" test was relatively short-lived: it was limited by *United States v. Felix*, — U.S. —, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992), and explicitly overruled by *United States v. Dixon*, — U.S. —, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). In the interim, however, the Second Circuit

struggled to apply the dictates of *Grady* to double jeopardy cases involving successive conspiracy prosecutions. *See e.g. United States v. Calderone*, 917 F.2d 717 (2d Cir. 1990) ("*Calderone I*"), *vacated and remanded*, — U.S. —, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992) (remanding case for further consideration in light of *Felix*); *United States v. Gambino*, 920 F.2d 1108 (2d Cir. 1990) ("*Gambino I*"), *vacated and remanded*, — U.S. —, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992) (remanding case for further consideration in light of *Felix*).

■ Despite this somewhat turbulent history, the Second Circuit has now clarified that the Supreme Court has "returned double jeopardy jurisprudence to its pre-Grady dimensions." *United States v. Liller*, 999 F.2d 61, 63 (1993). Prior to *Grady*, the starting point for any determination of whether successive conspiracy prosecutions charged the same offense was the multifactor analysis set forth in *United States v. Korfant*, 771 F.2d 660 (2d Cir.1985). *Korfant* is still good law. *United States v. Calderone*, 982 F.2d 42, 45 (2d Cir.1992) ("*Calderone II*"); *United States v. Gambino*, 968 F.2d 227, 232 (2d Cir.1992) ("*Gambino II*"). Accordingly, the following "*Korfant*" factors must be considered in determining whether two conspiracies are the same offense for double jeopardy purposes:

> (1) the criminal offenses charged in successive indictments; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies.

*Korfant*, 771 F.2d at 662 (citations omitted). Application of these factors is no easy task: "neither *Korfant* nor the decisions that have endeavored to apply it have explicitly clarified the analytic framework in which the identified factors are to be assessed." *Calderone II*, 982 F.2d at 45. Nevertheless, the parties agree that in successive conspiracy cases the *Korfant* factors should be used by the Court to assess whether, under the "to-

tality of the circumstances," the two conspiracies should be considered the same or different offenses. *Korfant,* 771 F.2d at 662.

■ In a motion to dismiss based on double jeopardy grounds, the moving defendant bears the initial burden of demonstrating that the two charged conspiracies were in fact the same. If a defendant makes a sufficient showing of overlap, the burden shifts to the government " 'to rebut the inference of unity.' " *U.S. v. Reiter,* 848 F.2d 336, 341 (2d Cir.1988), (quoting *United States v. Abbamonte,* 759 F.2d 1065, 1069 (2d Cir.1985)) (other citations omitted).

■ McGowan argues that Count One in this case simply charges a smaller component of the same conspiracy for which he was acquitted in the *Windows* trial. He points out that the broad labor payoff conspiracy charged in Count Four of *Windows,* by the very terms of the indicting language, included private jobs like the Spring Creek conspiracy for which he is now being prosecuted. In response, the government insists that the Spring Creek conspiracy was not included within the ambit of the *Windows* payoff conspiracy—even as it concedes that the *Windows* indictment included at least one private window replacement job. *See* Government's Memorandum at 3–4. In essence, the government argues that, separate and apart from the massive labor payoff conspiracy about which this Court heard extensive testimony over many months, defendants McGowan and Nulty organized their own extracurricular conspiracy to demand and accept payoffs on the Spring Creek job, presumably behind the backs of their arguably more sinister colleagues in organized crime.

Ironically, each party's current interpretation of the scope of the *Windows* indictment is virtually the opposite of the one each advanced during the *Windows* trial. For example, when the government in the *Windows* prosecution began to elicit evidence related to the Spring Creek job, McGowan's counsel objected, arguing that such evidence "is not related to this case. . . . [I]t's outside the bounds of this conspiracy." *See Windows* Trial Transcript at 7704–08; Government's Memorandum at 9–10. Now counsel argues that the Spring Creek conspiracy was included within the *Windows* charge. By the same token, on a different occasion, when attempting to convince the Court that it was proper to admit evidence of labor payoffs related to private (as opposed to NYCHA) job sites, the Assistant U.S. Attorney in *Windows* pointed out that in fact "the indictment charges private work and public jobs. . . . The indictment specifically charges these matters." *See Windows* Trial Transcript at 1475–78; Defendant's Reply Memorandum at 2–6. Now, of course, the government contends that the *Windows* payoff conspiracy did not include the private Spring Creek conspiracy and thus McGowan was never put in jeopardy for his conduct related to Spring Creek. In fact, the government was right the first time: the *Windows* indictment does indeed charge a conspiracy that encompasses both public jobs *and* private work like the Spring Creek project.

Adversarial machinations aside, by applying the *Korfant* factors to this case, the Court finds that McGowan has readily met his burden of going forward. Even the government concedes that three of the *Korfant* factors—the offenses charged, the overlap of time, and the geographic scope—demonstrate a "direct similarity between the cases." Government's Memorandum at 17. Accordingly, the burden shifts to the government to show, by a preponderance of the evidence, that two separate conspiracies existed. *See United States v. Waldbaum, Inc.,* 612 F.Supp. 1307, 1313 (D.C.Conn.1985), *aff'd, United States v. Korfant,* 771 F.2d 660 (2d Cir.1985). *See also Reiter,* 848 F.2d at 340.

A common sense application of the *Korfant* multi-factor analysis to the facts of this case reveals that the narrow conspiracy McGowan is charged with here was encompassed within the broad conspiracy charged in *Windows.*

1. *The criminal offenses charged, the overlap of time, and the geographic scope*

As noted above, the factors of criminal offenses charged, time, and geographic scope suggest the existence of a single conspiracy. In both cases, McGowan is charged with precisely the same statutory violation, a labor payoff conspiracy under the Taft–Hartley

Act; the time frame of the conspiracy charged in this case (1988–1989) is contained entirely within the time frame of the broad conspiracy charged in *Windows* (January 1, 1979 to the date of the indictment in 1990); and the geographic scope of the conspiracy charged in this case (metropolitan New York) is the same as the geographic scope of the broad conspiracy charged in *Windows* (metropolitan New York). *See Windows* Indictment at ¶¶ 37; *McGowan* Indictment at Count One.

The remaining five *Korfant* factors will be examined in turn.

### 2. *The overlap of participants*

There is an overlap among the participants in both conspiracies. In Count Four of the *Windows* indictment, McGowan was among the fifteen named defendants and Nulty was an unnamed co-conspirator. *See Windows* Indictment at ¶ 37. In this case, only McGowan and Nulty are charged by name. *See McGowan* Indictment at Count One. As a consequence, the government argues, without elaboration, that the *Korfant* factor of overlap of participants favors the government's position that two separate conspiracies were involved. However, since the indictment in *McGowan* charges that unnamed "others" were involved in the Spring Creek conspiracy, the government's position is hardly convincing.

Any reasonable assessment of the roster of likely unnamed conspirators in *McGowan* would of necessity include many of the same players who were implicated in the payoff conspiracy charged in the *Windows* case. The overt acts alleged in *McGowan* confirm that the murdered John "Sonny" Morrissey, a defendant in *Windows,* is one of the "others" alleged to be members of the *McGowan* conspiracy. The evidence at the *Windows* trial convincingly portrayed Sonny Morrissey as the linchpin between the corrupt Local 580 and his associates within the hierarchy of the Luchese Crime Family. Any common sense assessment of the *Windows* evidence, therefore, leads to the conclusion that, for the purposes of the payoff conspiracy, Local 580, Morrissey, and the Luchese family were one and the same. *See e.g. Windows* Trial Transcript at 10907 (Assistant U.S. Attorney stating in *Windows* summation that "Local 580 remained the property and under the influence and control of the Luchese Crime Family."). Since the government has not argued that Spring Creek represents an independent venture perilously undertaken by McGowan and Nulty, the overlap of criminal actors weighs in favor of McGowan's position that a single conspiracy existed.

### 3. *Similarity of operation*

The conspiracies operated similarly. The government concedes similar operation of the conspiracies in that both conspiracies involved an agreement to accept illegal payments from contractors doing business with Local 580. Government's Memorandum at 18. The government then points to several supposed differences: for example, the Spring Creek conspiracy required "a specific meeting" to further the act and the Spring Creek windows were "prefab" as opposed to being installed at the factory. *Id.*

The government fails to present meaningful distinctions between the conspiracies. The fact that a specific meeting may have been required for Spring Creek is scarcely proof of the existence of a separate conspiratorial agreement. The meeting may have been called, not to forge an agreement, but to resolve how the parties' prior agreement would be implemented given the peculiarities of a particular contract. Moreover, even a separate 'agreement' could easily represent a sub-pact in the course of a "continuous conspiratorial relationship." *United States v. Liotard,* 817 F.2d 1074, 1079 (3d Cir.1987) (quoting LaFAVE & SCOTT, CRIMINAL LAW at 480 (1973)). Indeed, in *United States v. Liotard* the Third Circuit rejected a similar argument: "It is absurd to think that, once the participants agreed to a general plan ... their actions would henceforth become automatic and that any additional meeting to organize the specific subplots of their overall scheme would be either superfluous or indicative of a separate conspiracy." *Liotard,* 817 F.2d at 1079 n. 8. By the same token, the fact that the Spring Creek windows were "prefab" is of limited significance. In a real sense, therefore, the modus operandi of the two alleged conspiracies was essentially the same: in both cases, corrupt Local

580 officials, backed and controlled by organized crime figures, allegedly extracted money from contractors on window replacement jobs. The methodologies were similar, as were the victims and the beneficiaries. This factor, then, clearly favors McGowan's contention that the two conspiracies are in fact one.

#### 4. The existence of common overt acts

To the extent that a comparison of the alleged overt acts may be instructive, the government argues that since there is no repetition or overlap, distinct conspiracies are charged. It is true that in the labor payoff conspiracy charged in Count Four of *Windows,* some eighty-one racketeering acts were listed as overt acts in furtherance of the conspiracy. *Windows* Indictment. Most, but not all, of these acts related to window replacement jobs done at New York City Housing Authority developments; none related to the private Spring Creek development. *Id.* at ¶¶ 1–19. This factor, therefore, suggests, albeit weakly, that the conspiracies may in fact be distinct.

A closer look at the overt acts, however, confirms that the conspiracies are, for double jeopardy purposes, one and the same. The first overt act in *McGowan* is a March 7, 1988 meeting which was recorded by Peter Savino, the principal government witness in the *Windows* trial, and was in fact introduced into evidence in *Windows.*[3] Other than Savino, the identified participants at this meeting were McGowan, Nulty, and Morrissey—all of whom were charged as conspirators or unindicted co-conspirators in *Windows*—along with Sandy Monosson, the subcontractor on the Spring Creek job. *See Windows* Trial Record, Government Exhibit 5–B–20. As noted above, the testimony at the *Windows* trial showed (somewhat convincingly) that Local 580 was controlled by the Luchese family through Sonny Morrissey. It seems clear, therefore, that, given the broad language of the labor conspiracy charged in the *Windows* indictment, the government, had it chosen to do so, could have listed the Spring Creek payoffs as overt acts in furtherance of that conspiracy. If that is the case, then the

fact that the government did not list any agreements or payoffs related to Spring Creek as overt acts in *Windows* and that none of the overt acts listed in *Windows* is listed in the conspiracy charged here is by no means dispositive of whether the two conspiracies are distinct. Choosing to prosecute seriatim a host of virtually identical conspiracy cases, distinguished only by the specific overt acts chosen by the government during the drafting process, is forbidden by the double jeopardy clause. "The constitutional provision against double jeopardy is a matter of substance and may not be thus nullified by the mere forms of criminal pleading." *United States v. Mallah,* 503 F.2d 971, 985 (2d Cir.1974) (quoting *Short v. United States,* 91 F.2d 614, 624 (4th Cir.1937)), *cert. denied,* 420 U.S. 795, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). *See also e.g. United States v. Sinito,* 723 F.2d 1250, 1256 (6th Cir.1983), *cert. denied,* 469 U.S. 817, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984) ("The government, in a criminal conspiracy case, is often presented with a host of co-conspirators and a multiplicity of overt acts. An overzealous prosecutor, in drafting the indictment, could choose certain overt acts in one indictment and a different set of overt acts in a second indictment, thereby carving up one conspiracy into two or even more artificial offenses."). .

#### 5. Common objectives

Simply put, the object of both conspiracies was money. In both cases, the objective of the union defendants was the receipt of illegal monetary payments from window contractors. Paragraph 6(e) of the *Windows* indictment, which was specifically incorporated and realleged in the *Windows* labor payoff count, reveals that the two charged conspiracies had similar objectives. In the words of the indictment, one "purpose" of the *Windows* enterprise was to obtain money for the defendants and their co-racketeers "[t]hrough payoffs to Local 580 to use non-union labor in order to achieve an unfair competitive advantage in securing window installation contracts offered and awarded by *private, commercial* and governmental *building owners and developers.*" *Windows* In-

---

**3.** At the *Windows* trial Peter Savino testified that the project discussed at the March 7, 1988 meet-

ing was the Spring Creek window replacement job. *See Windows* Transcript at 5055–59.

dictment at ¶ 6(e) (emphasis added). In addition, the introduction to the *Windows* indictment states that the "enterprise seized corrupt control of certain private sector window jobs as well." *Id.* at ¶ 1. Interpreted in this light, the objectives of the conspiracy alleged in *McGowan*—a conspiracy to receive payoffs related to the private sector Spring Creek window replacement job—are entirely consistent with the *Windows* allegations.

The government lists several distinguishing characteristics that ostensibly demonstrate that the objectives of the two charged conspiracies were different: in the Spring Creek conspiracy, unlike in *Windows*, (1) there was an issue as to which union (the carpenters or the ironworkers) had jurisdiction over the job; (2) the type of work (factory as opposed to indoor) was different; and (3) there were no related bid-rigging or extortionate acts. Government's Memorandum at 19–20. The Court is not persuaded by this line of argument. Even if there are some distinguishing details, the principal characteristic of each conspiracy was the payment of money for labor peace.

### 6. *The degree of interdependence between alleged distinct conspiracies*

Finally, *Korfant* teaches "the degree of interdependence between alleged distinct conspiracies" is another guidepost in determining whether the two conspiracies are the same for jeopardy purposes. The exercise in this case makes it clear that the conspiracies are the same, and that the protections of double jeopardy bar trial on Count One.

The government argues that "the interdependence factor ... dictates that these were separate conspiracies." Government's Memorandum at 20. Theoretically, of course, the two conspiracies could legally coexist, as the government now argues, related but independent of each other, and as such the common defendants could be prosecuted for their involvement in each. Indeed, the government *claims* that the larger *Windows* payoff conspiracy was related almost exclusively to the enterprise's continuing endeavor to control the New York City Housing Authority market and rig the bids on the lucrative public housing projects. *See* Government's Memorandum at 3–4. The government seems to characterize the *McGowan* conspiracy as an intramural undertaking of corrupt union officials for their own account, separate and independent of their partners in organized crime.

Certain impediments confront the government's glib characterization of the two charges. First, the specific charges do not on their face support this theory of independence. While the government might have chosen to limit the larger *Windows* conspiracy to Housing Authority work, it simply did not do so. *See Windows* Indictment at ¶¶ 1, 6(e). Second, even if the government had more narrowly tailored the *Windows* conspiracy, the government sought to prove at the *Windows* trial a payoff conspiracy that went far beyond those confines and tended to prove that the *Windows* conspirators sought every opportunity, public and private, to enrich themselves by imposing on private contractors through their willing union allies the customary $1 to $2 per window charge for union peace and the opportunity to install their windows at favorable rates. Indeed, it was this familiar currency and routine that dominated the latter stages of the *Windows* conspiracy as the conspirators, inspired by government witness Savino, sought, for the most part unsuccessfully, to return everyone to the good old days of bid rigging and soaring profits.

Finally, a close look at the charging language in the *McGowan* conspiracy in the context of the trial evidence and charge in *Windows* reveals a number of telling characteristics which further support the conclusion that the two conspiracies are one. Although the government has not disclosed the identity of the "others" referenced in the conspiracy count, it is obvious that the *McGowan* conspiracy is not limited to Local 580 officials. Prominently featured in the overt acts charged is the late Sonny Morrissey who provided the critical link between the union and the controlling hierarchy of the Luchese crime family, Messrs. Amuso and Caso. Mr. Savino, the government's principal witness at the *Windows* trial, was a participant in the important, recorded meeting of March 7, 1988 serving in his customary role as expeditor bringing contractor and union represen-

tatives together to negotiate the amount of the payoffs on yet another job, this time Spring Creek. And while Mr. Savino was himself only feigning a conspiratorial role, in a real sense he continued to represent the interests of the Genovese family and in particular his patron, Mr. Mangano, who repeatedly emphasized that he wanted no one to know that he was in the window business.

But the government's evidence showed that he was. And he was not alone. He and numerous other organized crime members and associates extended their business activities beyond the lucrative NYCHA Authority market seizing every opportunity to broaden their influence and control over manufacturers, installers, and contractors whose work fell within the jurisdiction of Local 580. The government cannot demonstrate that the there was anything special or unique about the Spring Creek job that necessitated a separate conspiratorial agreement. While Spring Creek may have had its own peculiarities and difficulties requiring the deft hand of Mr. Savino to overcome, like so many other jobs, the agreement to demand and receive payoffs was long since in place and Savino's guidance did not involve the question of whether there should be an agreement, but rather *how* the long standing agreement should be implemented in the Spring Creek contract.

In sum, considering the totality of circumstances surrounding the issue before the Court, including the charges and the evidence already advanced, albeit unsuccessfully, by the government during the *Windows* trial, and the theory of that prosecution, the Court is obliged to conclude that the two conspiracies are the same for double jeopardy purposes.

A review of the eight specified *Korfant* factors demonstrates that the government has failed to sustain its burden of proving that two separate conspiracies existed. The criminal offenses charged in both conspiracies are the same. (*Korfant* factor 1.) At least some (and perhaps many) of the principal defendants are charged in both conspiracies and, as noted earlier, the time span and geographic scope of the *McGowan* conspiracy falls entirely and comfortably within the

larger *Windows* charge. (*Korfant* factors 2, 3, 6.) The conspiracies operated similarly and had the same objectives—to enrich the conspirators at the expense of private contractors engaged in public and private work through the wrongful use of union power. (*Korfant* factors 4 and 7.) Finally, as just demonstrated, the charged conspiracies did not operate independently of one another. (*Korfant* factor 8.) In short, the "degree of commonality" is high and the "degree of difference" is virtually imperceptible. *Calderone*, 982 F.2d at 46.

For these reasons, the two conspiracies are "in fact and in law the same" for jeopardy purposes. *Reiter*, 848 F.2d at 340. In essence, the Government has responded to McGowan's acquittal in *Windows* by attempting to retry him for a smaller conspiracy in the hope of a more favorable outcome. This course of action is forbidden by the Fifth Amendment. Accordingly, Count One of this indictment is barred by the double jeopardy clause and must be dismissed.

### B. *Counts Two and Three*

■ McGowan relies on a combination of double jeopardy and collateral estoppel arguments in urging that Counts Two and Three of the indictment be dismissed. It is well-settled that under traditional double jeopardy analysis, a previous conspiracy prosecution does not serve as a bar to a later prosecution for a related substantive offense. *See United States v. Felix*, — U.S. —, —, 112 S.Ct. 1377, 1384, 118 L.Ed.2d 25 (1992); *see also Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946) (". . . [T]he commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses.") As a consequence, McGowan devotes most of his energy to arguing that the doctrine of collateral estoppel, which is embodied within the double jeopardy clause, requires the dismissal of Counts Two and Three.

■ Collateral estoppel, a doctrine developed in the context of civil litigation, prevents an issue that has been fully and fairly litigated in one suit from being relitigated in another suit between the parties. *See* RE-

STATEMENT (SECOND) OF JUDG-MENTS § 17 (1980). In the context of a criminal case, the doctrine of collateral estoppel bars the government from relitigating an issue decided in a defendant's favor by a valid final judgment. *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). Judge Friendly has written that the application of the collateral estoppel doctrine always has two phases. First the Court must determine, by analyzing both the indictment and the record in the previous trial, what the first judgment decided. Then the Court must go on to examine how that determination bears on the second case. *See United States v. Kramer*, 289 F.2d 909, 913 (2d Cir.1961).

■ In a criminal case, the first phase of the analysis—determining what issues the jury resolved in the previous trial—can be exceedingly difficult because of the nature of juries and the general verdicts they render. The Second Circuit has held that the burden is on the defendant to demonstrate that " 'the issue he seeks to foreclose from litigation in the present prosecution was necessarily decided in his favor by the prior verdict.' " *United States v. Citron*, 853 F.2d 1055, 1059 (2d Cir.1988) (quoting *United States v. Cala*, 521 F.2d 605, 608 (2d Cir.1975)) (other citations omitted). Thus, in a case where "the previous acquittal was based on a general verdict, the court must 'examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' " *Citron*, 853 F.2d at 1059 (quoting *Ashe v. Swenson*, 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970)) (other citations omitted). Courts have been enjoined not to take a hypertechnical view of

the analysis thereby making the defendant's burden overly difficult. *Citron*, 853 F.2d at 1058 (citations omitted). However, a criminal defendant's burden has been acknowledged to be "particularly onerous where the acquittal in the first trial involves the crime of conspiracy." *United States v. Clark*, 613 F.2d 391, 400 (2d Cir.1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980) (citing *United States v. Tramunti*, 500 F.2d 1334, 1346–1349 (2d Cir.), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974)). Indeed, it has been recognized that "[s]ince it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case, it is a rare situation in which the collateral estoppel defense will be available to a defendant." *Citron*, 853 F.2d at 1058 (citing *Tramunti*, 500 F.2d at 1346).

■ Applying the rule of collateral estoppel to the facts of this case, McGowan must demonstrate that the jury in *Windows* could not reasonably have reached its verdict acquitting McGowan on the broad labor payoff conspiracy charge without also deciding that McGowan was innocent of conspiring to accept a labor payoff concerning the Spring Creek development. In fact, the limited amount of evidence involving the Spring Creek project represented a minuscule aspect of the *Windows* trial, and was never fully developed at trial. *See* Government's Memorandum at 8–9.[4] Indeed, in the context of a six month jury trial, McGowan focuses so much attention on a supplemental response by the government to McGowan's request for a bill of particulars, *see* Defendant's Memorandum at 3–5, and on sidebars that took place out of the hearing of the jury, *see* Defendant's Reply Memorandum at 2–4, precisely because so little information relating to Spring Creek emerged at trial. A

---

**4.** The government implies that evidence of the Spring Creek conspiracy was not fully developed because of evidentiary rulings by the Court. *See* Government's Memorandum at 11 (arguing that the result of defense counsels objections to the admission of Spring Creek evidence "was the exclusion of proof connected with the very offense of which he is now claiming he was acquitted.") *See also id.* at 22, 25. The reality is far less conclusive. At the time in question, the

Court merely deferred ruling on whether the evidence was proper until re-direct: "You're going to have a chance to redirect this witness. If I think it's appropriate, I'll let you bring it out." *Windows* Trial Transcript at 7707–08. The government never sought to re-direct the witness. However, the fact remains that McGowan was by no means already tried for the Spring Creek payoffs.

realistic evaluation of the *Windows* verdict reveals that the jury did not, by any means, necessarily find McGowan innocent of the substantive Spring Creek payoffs.

In this crucial way this case is instantly distinguishable from many of the drug conspiracy cases cited by McGowan. In those cases, because of the comparative simplicity of the original charge, the reviewing courts had less difficulty determining what the jury had necessarily decided in rendering its original verdict. *See United States v. Mespoulede,* 597 F.2d 329, 333 (2d Cir.1979) (in acquitting defendant at first trial, jury must have found that the defendant did not possess cocaine on specific date charged); *United States v. Seley,* 957 F.2d 717, 721 (9th Cir.1992) (in acquitting defendant at first trial, jury must have found that defendant did not know vehicle contained marijuana); *United States v. Gornto,* 792 F.2d 1028, 1031 (11th Cir.1986) (in acquitting defendant at first trial, jury must have found that defendant did not possess and distributed drugs at specific apartment); Defendant's Memorandum at 17–18. In a massive conspiracy like the one charged in *Windows,* however, it is far more difficult to ascertain what issues the jury necessarily decided in rendering its verdict. Defendant's reliance on *Calderone II* is also misplaced. In *Calderone II,* the government was barred on double jeopardy grounds from bringing a charge of conspiracy to distribute heroin. Among the substantive offenses that the government contended were not barred by the conspiracy acquittal were substantive telephone counts charging that the telephone was used to conspire to distribute heroin—the very same conspiracy which the Court had held was barred by double jeopardy. *Calderone II,* 982 F.2d at 48. In *McGowan,* since the substantive Taft–Hartley offense does not have as one of its elements the labor payoff conspiracy, the *Calderone II* logic is inapposite. The Court finds that the other cases upon which defendant relies are also distinguishable. Finally, the Court notes that, given the circumstances of this case, "fundamental considerations of fair play," *Mespoulede,* 597 F.2d at 333, are by no means offended by requiring McGowan to stand trial on the substantive charge of accepting a labor payoff related to the Spring Creek project. For all these reasons, then, *McGowan* is not one of those rare cases where collateral estoppel can be invoked to bar the government from bringing a substantive charge.

Since McGowan has not sustained his burden of establishing that his acquittal in Count Four of *Windows* necessarily resolved the substantive offenses charged in Counts Two and Three of this case, the motion is denied as to Counts Two and Three.

■ Finally, defendant argues that Counts Two and Three should be dismissed based on the "supervisory power" of the Court. Defendant's Memorandum at 19–21. However, despite defendant's advocacy, the Court does not believe that subjecting McGowan to trial on the substantive labor payoff charges would be "inequitable," "unfair," or "questionable." Defendant's Memorandum at 19–21. Therefore, since the Court has determined that defendant has not satisfied the standards for dismissal under either the double jeopardy clause or the doctrine of collateral estoppel, the Court declines defendant's invitation to dismiss the charges.

### III. *CONCLUSION*

For the foregoing reasons, McGowan's Motion to Dismiss should be *granted* as to Count One and *denied* as to Counts Two and Three.

SO ORDERED.