320 F.3d 173
 UNITED STATES of America, Appellee,
v.
Frank ESTRADA, also known as The Terminator, also know as Big Dog, also known as "Mustard"; Edward Estrada, also known as French Fry, also know as Susan Kock Fry, Isaias Soler, also known as Eso, also known as "Dog"; Nelson Carrasquillo; William Rodriguez, also known as Billy Rodriguez, also known as William Gomez, also known as Billy Gomez, also known as Billy the Kid; Felix DeJesus, also known as Dino; Charles DeJesus, also known as Chino; Eddie Lawhorn, also known as Fat Boy; Yamarr Shipman, also known as Country; also known as Pak Chong Mar; Michael Hilliard, also known as Mizzy; Pablito Cotto; Rosario Cotto, also known as Sato; Benito Rosario; Ricardo Rosario, also known as "Q"; Jermaine Jenkins, also known as "Fats"; Makene Jacobs, also known as Madee; Joseph Butler, also known as Pee Wee; Viviana Jiminez; Kelvin Vereen, also known as Nino; Daniel Herredia, also known as D-Nice; Felipe Santana, also known as Omar Soto; Tamarius Maner, also known as Trigger; Gloria Vargas; Victor Cruz,
also known as Casper; Enrique Martinez, also known as Ricky Zapata; Carmen Coto, also known as "CC," Defendants,
Hector Gonzalez, also known as June Bug, Defendant-Appellant.
 Docket No. 02-1173.
 United States Court of Appeals, Second Circuit.
 Argued: November 8, 2002.
 Decided: February 12, 2003.
 
 Christopher J. McCarthy, Brown, Paindiris & Scott, LLP, Glastonbury, CT, for Defendant-Appellant.
 Robert M. Spector, Assistant United States Attorney for the District of Connecticut, New Haven, CT (Alex Hernandez, Assistant United States Attorney, Alina P. Marquez, Assistant United States Attorney, and John A. Danaher III, United States Attorney, on the brief), for Appellee.
 Before: WALKER, Chief Judge, and OAKES and MINER, Circuit Judges.
 MINER, Circuit Judge.
 
 
 1
 Defendant-appellant Hector Gonzalez appeals from an order of the United States District Court for the District of Connecticut (Underhill, J.) denying a motion by Gonzalez to dismiss on double jeopardy grounds so much of a sixteen-count indictment filed in the District of Connecticut as charges him with two counts of narcotics conspiracy ("Connecticut Indictment"). In Count Twelve, Gonzalez was one of a number of named defendants, along with "others known and unknown to the Grand Jury" charged with conspiracy to "possess with intent to distribute 1000 grams or more of a mixture or substance containing a detectable amount of heroin." In Count Thirteen, Gonzalez and a number of other named defendants "and others known and unknown to the Grand Jury" are charged with conspiracy to "possess with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of cocaine base or `crack.'"
 
 
 2
 In an indictment previously filed in the United States District Court for the Eastern District of New York, Gonzalez was charged in a two-count indictment ("New York Indictment"), along with two named co-defendants, with conspiracy to possess with intent to distribute cocaine and attempting to possess with intent to distribute cocaine. Gonzalez entered a plea of guilty to the conspiracy count of that indictment, pursuant to a written agreement dated November 13, 1997 with the office of the United States Attorney for the Eastern District of New York. The District Court, faced with the motion to dismiss Counts Twelve and Thirteen of the Connecticut Indictment for double jeopardy as a consequence of the New York Indictment and plea, entered the order denying dismissal subject of this appeal. The District Court determined that the heroin conspiracy charged was distinct from the earlier indictment. As to the cocaine conspiracy charged, the District Court reasoned that, although the same conspiracy was charged in the New York Indictment, the Government did not know and could not reasonably have known of the facts supporting the Connecticut Indictment when the New York Indictment was filed. We affirm the order as to both of the counts subject of the District Court's ruling but for reasons different from those given by the District Court in regard to the cocaine conspiracy charged.
 
 BACKGROUND
 
 3
 In May of 1997, Special Agents of the Drug Enforcement Administration ("DEA") in the Eastern District of New York learned that one Cano-Lopez was interested in purchasing up to ten kilograms of cocaine. This information was furnished by confidential informants who represented that they were prepared to act as suppliers. Cano-Lopez informed them that he knew of an unidentified buyer from Connecticut who would come to New York to purchase the cocaine, but he provided no further information. Appellant Gonzalez was arrested on June 4, 1997 in Queens, New York when he came to make a ten-kilogram cocaine purchase from Cano-Lopez. A search of Gonzalez' vehicle produced approximately $125,000 in United States currency, and over $1,600 in cash was seized from his person. Cano-Lopez was arrested at the same time and gave a post-arrest statement to the DEA. In the statement, he described the role of Gonzalez in the conspiracy to purchase the cocaine to be supplied by the confidential informants. He also implicated a man named Jose Mota, who apparently acted as a lookout during the attempted cocaine transaction.
 
 
 4
 DEA Special Agent Mark Tully testified before the grand jury in the Eastern District on June 17, 1997. He was the only witness to testify in regard to the events leading to the arrest of Gonzalez and Cano-Lopez. He testified that a meeting took place on May 30, 1997 in the Northern Boulevard area of Queens, New York between Cano-Lopez and the two confidential informants. The meeting was conducted under the surveillance of agents of the DEA and was tape-recorded. According to Tully, Cano-Lopez agreed to purchase ten kilograms of cocaine at $25,000 per kilogram from the informants. On June 2, 1997, the informants received a telephone call from Cano-Lopez, who advised that "his people" in Connecticut were putting the money together and would not be able to complete the purchase until later in the week. Further negotiations regarding the purchase price resulted in an agreed price of $23,000 per kilogram for the ten kilograms of cocaine.
 
 
 5
 On June 4, 1997, Cano-Lopez called the informants and advised that he and his people from Connecticut were ready to complete the ten-kilogram deal, and arrangements were made to meet at a Burger King Restaurant on Northern Boulevard. DEA agents set up surveillance at that location and, at approximately 5:00 p.m., observed two individuals arrive in a 1988 Corsica automobile driven by Cano-Lopez. The Corsica was followed into the parking lot of the restaurant by a red 1997 Dodge Intrepid automobile driven by Gonzalez. After a conversation between Cano-Lopez and the two informants, Cano-Lopez signaled Gonzalez to approach. Then all present walked over to Gonzalez' vehicle. Gonzalez opened the trunk, in which the informants saw a bag containing a box with United States currency inside. The confidential informants advised that they were going to get the ten kilograms of cocaine, whereupon the agents arrested Cano-Lopez and Gonzalez.
 
 
 6
 Following the testimony of Agent Tully before the grand jury, the grand jury charged Gonzalez and Cano-Lopez, as previously noted, with "conspir[ing] to possess with intent to distribute cocaine, a Schedule II narcotic drug controlled substance in violation of Title 21 United States Code, Section 841(a)(1)" (Count One) and with "attempt[ing] to possess with intent to distribute cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21 United States Code, Section 841(a)(1)" (Count Two). Both offenses were alleged to have been committed "between May 30, 1997 and June 4, 1997, both dates being approximate and inclusive." On July 3, 1997, Special Agent Tully made another grand jury appearance. Again, he was the only witness to testify, and his testimony paralleled that given on June 17. There were only two differences. One was that he identified Mota as an individual who arrived with Gonzalez and acted as a lookout during the transaction on June 4. He testified that Mota was arrested at the same time as Gonzalez and Cano-Lopez. The other difference in Tully's testimony was his description of the exact amount of cash found in Gonzalez' vehicle — $125,185. Thereafter, a superseding indictment was issued charging Mota along with Gonzalez and Cano-Lopez with the same crimes covering the same time period charged in the first indictment.
 
 
 7
 By plea agreement entered into with the office of the United States Attorney for the Eastern District of New York dated November 13, 1997, Gonzalez agreed to enter a plea of guilty to the conspiracy count in return for the dismissal of the attempt count. In the agreement, the office of the United States Attorney agreed to make certain sentencing recommendations, and Gonzalez agreed not to appeal his conviction or sentence if the sentence were to be within or below the range of imprisonment terms specified in the agreement. Among other things, the agreement provided that it "is limited to the United States Attorney's office for the Eastern District of New York and cannot bind other federal, state or local prosecuting authorities." With respect to further administrative proceedings involving Gonzalez, the agreement provided that he "waives any claim of double jeopardy in the event that said proceedings have been, are, or will be initiated." After his guilty plea was accepted in accordance with the agreement, Gonzalez was allowed to remain at liberty until April 9, 1998, when his sentence was imposed. Gonzalez presently is serving that sentence, which provides principally for imprisonment for a term of 87 months, and five years of court-supervised release.
 
 
 8
 On another track, it appears that Special Agents of the Federal Bureau of Investigation in Connecticut had initiated an investigation in August of 1999 into the narcotics trafficking activities of one Frank Estrada. Eventually, separate indictments were returned on November 2, 2000 against Estrada and an associate in drug trafficking, Isaias Soler, by a grand jury empaneled by the United States District Court for the District of Connecticut.
 
 
 9
 It appears that Estrada was the head of a large organization engaged in the processing, packaging and distribution of narcotics. Certain individuals serving as lieutenants in the organization delivered packaged narcotics to street-level dealers. These dealers sold the narcotics at various locations within the P.T. Barnum Housing Project in Bridgeport, Connecticut and in other areas of Bridgeport and in other cities in Connecticut, including New Haven and Meriden. The organization obtained wholesale quantities of narcotics, including cocaine and heroin, from supply sources usually located outside the state. The cocaine customarily was converted into cocaine base or "crack" before being packaged for street-level distribution. Members of the organization resorted to violence to maintain the exclusive right to sell narcotics in particular locations. In December, 2000, the grand jury returned a superseding four-count indictment charging Estrada, Soler and twenty-two other members of the Estrada organization with offenses relating to the nefarious activities of the organization.
 
 
 10
 Early in 2001, Jose Lugo, who was serving a Connecticut state prison sentence, wrote to Assistant United States Attorney Alex Hernandez to advise that he had relevant information pertaining to the Estrada organization. Following the communication, Lugo was interviewed by government agents on a number of occasions. He provided valuable information to the agents and shortly thereafter testified at the trial of various codefendants of Gonzalez.
 
 
 11
 In his testimony, Lugo described the structure of the organization in great detail and identified a number of individuals who were involved in its activities. He testified about the manner in which the drugs were packaged in small bags, taped and stamped. His testimony included details about the activities of Estrada as head of the organization and of the lieutenants who were responsible for getting the narcotics into the hands of the runners or street sellers. As he described it, the lieutenants were also responsible for collecting the sales proceeds from the runners. Lugo also described the physical form in which the heroin and crack were sold. He identified various locations at which the narcotics were prepared for sale, the places where the narcotics were "stashed," and the steps taken by Estrada to enforce his territorial primacy in the locations where his runners sold drugs.
 
 
 12
 In his detailed testimony, Lugo provided the names of many of the members of the Estrada organization as well as the part each played in the activities of the organization. Among others, he identified Hector "June Bug" Gonzalez, the name by which he knew appellant. At one point, according to Lugo, "June Bug was in charge of all the lieutenants, ma[d]e sure that they was doing their job." Lugo gave further testimony describing the importance of Gonzalez in the operation of the organization. Lugo recalled that he was present with Estrada and Gonzalez in the summer of 1997 when Gonzalez insisted on going to New York City to replenish the organization's supply of heroin. Although Estrada was reluctant to do so, he gave Gonzalez a bag of cash to make the purchase. When Estrada learned that Gonzalez had been arrested in New York in the "sting" cocaine sale arranged by agents of the DEA on June 4, 1997, he immediately proceeded to Gonzalez' apartment and removed a safe. Estrada told Lugo that the safe contained cash, and they transported it to an apartment at another location.
 
 
 13
 Lugo testified that Gonzalez was released on bond after his arrest in New York and resumed his participation in the activities of the Estrada organization, although he was required to wear an electronic monitoring device on his leg as a condition of his bond. Apparently, Gonzalez continued his activities in the organization up to the time when he began to serve his sentence of incarceration. In the course of his extensive testimony before the grand jury, Lugo also revealed that the cocaine sold by the organization was packaged in "slabs" or small plastic bags containing cocaine base. Based on information furnished by Lugo and others, the grand jury in Connecticut returned a Third Superseding Indictment on June 20, 2001. That indictment, insofar as it pertains to Gonzalez, is the subject of the double jeopardy ruling by the District Court presently before us. The Third Superseding Indictment charged Frank Estrada and twenty-one persons associated with his organization in sixteen separate counts alleging: racketeering; racketeering conspiracy; violent crime in aid of racketeering (murder); accessory after the fact to violent crime in aid of racketeering (murder); use of firearm in relation to violent crime (two counts); witness tampering/obstruction (two counts); conspiracy to engage in witness tampering/obstruction; Hobbs Act violation; violent crime in aid of racketeering (assault); conspiracy to possess with intent to distribute and to distribute heroin; conspiracy to possess with intent to distribute cocaine base; continuing criminal enterprise; criminal forfeiture; and bank fraud. Not all the defendants named in the indictment were charged in all counts.
 
 
 14
 Although Gonzalez was described in the Connecticut Indictment as a member of the enterprise headed by Frank Estrada, he was not charged in either the racketeering or racketeering enterprise counts, or in any of the other counts except for Count Twelve, entitled "Heroin Conspiracy," covering the period 1991 — May 2001, and Count Thirteen, entitled "Cocaine Base or `Crack' Conspiracy," covering the period 1995 — January 2001. Frank Estrada and eighteen others in Count Twelve and eleven others in Count Thirteen were charged along with Gonzalez. In a December 2001 motion to dismiss these two counts as to him, Gonzalez claimed that his right to be free of double jeopardy would be violated if he were to be prosecuted on these two counts. The basis for this claim is that the conduct alleged is the same as the conduct subject of the New York Indictment to which he pled guilty. In denying the motion to dismiss for double jeopardy, the District Court determined, in an unpublished February 22, 2002 ruling, that Gonzalez had met his initial burden of showing that his double jeopardy rights were implicated by the two indictments. Noting that the burden therefore shifted to the Government to establish distinct conspiracies, the District Court concluded that the Government had "overwhelmingly" met that burden as to Count Twelve. Underlying that determination was the court's finding that Count Twelve charged a heroin conspiracy while the New York Indictment charged a distinct cocaine conspiracy and that Gonzalez was purchasing cocaine at the time of his arrest.
 
 
 15
 With regard to Count Thirteen, the District Court determined that "it would be improper to conclude that Gonzalez' attempted purchase of cocaine as alleged in the New York Indictment was a distinct conspiracy from the overarching `single venture' to procure cocaine to be converted and sold as cocaine base as alleged in Count XIII of the Connecticut Indictment." However, the District Court denied dismissal of Count Thirteen for double jeopardy, holding:
 
 
 16
 [A]lthough Count 13 of the Connecticut Indictment charges the same conspiracy as that charged in the New York Indictment, and prosecution of Count 13 would, as a consequence, ordinarily be barred, dismissal is not appropriate because the Government did not know, and could not reasonably have known, of the facts supporting the charges in Count 13 of the Connecticut Indictment at the time it charged Gonzalez in the New York Indictment.
 
 DISCUSSION
 
 17
 We review de novo as a question of law the denial of a motion to dismiss an indictment on double jeopardy grounds. United States v. Morgan, 51 F.3d 1105, 1110 (2d Cir.1995).
 
 
 18
 The protection against double jeopardy is enshrined in the Fifth Amendment of the United States Constitution, which provides that never "shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const., amend. V. "Under this Clause, once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor punished a second time for the same offense." Sattazahn v. Pa., ___ U.S. ___, 123 S.Ct. 732, 736, 154 L.Ed.2d 588 (2003).
 
 
 19
 The Double Jeopardy Clause confers its protections in three different situations — where there is a second prosecution for the same offense after acquittal of that offense; where there is a second prosecution for the same offense after conviction of the offense; and where there are multiple punishments for the same offense. Schiro v. Farley, 510 U.S. 222, 229, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994). The purposes served by the constitutional prohibition against double jeopardy include protection against the hazards of trial and possible conviction more than once for the same offense; preservation of the finality of judgments; and deprivation of an opportunity for the prosecution to supply evidence at a successive trial that it failed to present the first time around. United States v. DiFrancesco, 449 U.S. 117, 127-29, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980).
 
 
 20
 A double jeopardy claim cannot succeed unless the charged offenses are the same in fact and in law. United States v. Nersesian, 824 F.2d 1294, 1319 (2d Cir. 1987). In regard to double jeopardy questions in the context of successive conspiracy prosecutions, our inquiry is "whether the second prosecution is for a conspiracy distinct from that previously prosecuted. If the second prosecution is for a distinct conspiracy, there is no double jeopardy problem regardless of an overt act or other evidentiary overlap." United States v. Gambino, 968 F.2d 227, 231 (2d Cir.1992).
 
 
 21
 In this Circuit, we apply the so-called Korfant factors to determine whether the conspiracies are distinct. See United States v. Korfant, 771 F.2d 660, 662 (2d Cir.1985) (per curiam). The factors to be considered are as follows:
 
 
 22
 (1) the criminal offenses charged in successive indictments; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies.
 
 
 23
 Id. We are constrained to "consider the several Korfant factors with the lively awareness that no dominant factor or single touchstone determines whether" the compared conspiracies are in law and fact the same. United States v. Macchia, 35 F.3d 662, 668 (2d Cir.1994) ("Macchia I").
 
 
 24
 If a defendant makes a non-frivolous showing on a double jeopardy claim that the two conspiracies under review are not distinct, the burden shifts to the Government to prove by a preponderance of evidence that the conspiracies are separate. United States v. DelVecchio, 800 F.2d 21, 22 (2d Cir.1986). Assuming that Gonzalez has made the necessary showing of non-frivolity as to Count Twelve of the Connecticut Indictment (and it is by no means clear that this is so), the Government has carried the burden imposed upon it. The overlapping factors are practically nil with respect to Count Twelve and the New York Indictment. Although both charge conspiracy to possess with intent to distribute a controlled substance, the substance is heroin in the case of the Connecticut Indictment and cocaine in the case of the New York Indictment. There is no overlap of personnel with the exception of Gonzalez himself, and "a single common actor in what are allegedly two sets of conspiratorial activities does not establish the existence of a single conspiracy." Korfant, 771 F.2d at 663.
 
 
 25
 As for the overlap of time, the cocaine conspiracy charge in New York spanned less than one month in 1997, while the heroin conspiracy in Connecticut spanned a ten-year period commencing in 1991 and continuing after the arrest of Gonzalez on June 4, 1997. Aside from the fact that a different narcotic substance was involved in each conspiracy, the operations were totally dissimilar. The New York conspiracy involved a one-shot deal to purchase cocaine, while the Connecticut operation involved a long-term, ongoing, extensive and well-organized distribution network that purchased, prepared, packaged and sold the narcotics. The geographic locations of the particular cocaine and heroin conspiracies were different, and the common objectives and interdependence of the conspiracies could not overlap in view of the different substances, operations and personnel.
 
 
 26
 While it may be true that a prior cocaine distribution conspiracy can be the same in fact and law as a later heroin distribution conspiracy for double jeopardy purposes where the evidence demonstrates one overall distribution network, see, e.g., United States v. Abbamonte, 759 F.2d 1065, 1068-70 (2d Cir.1985), overruled in part on other grounds by United States v. Macchia, 41 F.3d 35, 38-39 (2d Cir.1994) ("Macchia II"), such is not the case here. In order for such nondistinct conspiracies to exist, it must be shown that there is but "one overall business among all the key figures to deal in both heroin and cocaine." Id. at 1070. Here, the only common "key" figure in both conspiracies was Gonzalez, and, although he apparently came to buy heroin in New York, he ended up attempting to buy cocaine. There simply was no evidence that an "overall business" existed. In sum, we agree with the conclusion of the District Court "that the Government has met its burden of showing that the conspiracy charged in the New York [I]ndictment is distinct" from the conspiracy charged in Count Twelve of the Connecticut Indictment.
 
 
 27
 The double jeopardy question is a closer one as pertains to the cocaine conspiracy described in the New York Indictment and the crack cocaine conspiracy described in Count Thirteen of the Connecticut Indictment presently under review. However, we disagree with the District Court's determination that "it would be improper to conclude that Gonzalez' attempted purchase of cocaine as alleged in the New York Indictment was a distinct conspiracy from the overarching `single venture' to procure cocaine to be converted and sold as cocaine base as alleged in Count 13 of the Connecticut Indictment." We think that the conspiracies were indeed distinct. While the two conspiracies do overlap somewhat with respect to time frame and criminal objective, such overlapping by no means negates the substantial dissimilarities that render the two offenses distinct. See Macchia I, 35 F.3d at 668. The fact that Gonzalez was purchasing cocaine in New York, apparently for conversion to cocaine base for sale by the Estrada organization in Connecticut during the course of the long-term conspiracy afoot in Connecticut, is insufficient to establish the requisite commonality. The application of the Korfant factors demonstrates why this is so.
 
 
 28
 1. The Criminal Offenses Charged in Successive Indictments. Applying this factor, we observe that the sole commonality is that both indictments charge narcotics conspiracies. This is a matter of little moment when the specifics of the charges are examined in conjunction with the other factors. See United States v. Reiter, 848 F.2d 336, 340-41 (2d Cir.1988). The New York Indictment charges a conspiracy to possess with intent to distribute cocaine, while Count Thirteen of the present indictment charges a conspiracy to possess with intent to distribute cocaine base or "crack." Although they share similar properties, the substances continue to be distinct for sentencing purposes.
 
 
 29
 2. The Overlap of Participants. Gonzalez is the only overlapping participant in these conspiracies, and he played a different role in each. Within the intendment of the New York Indictment, his offense lay in coming to New York to participate with others in the purchase of cocaine. Within the intendment of Count Thirteen of the Connecticut Indictment, he was for a much longer period of time a lieutenant in a large organization and engaged with others in an extensive trade in heroin and crack cocaine. We reject as speculative the District Court's finding that "[t]he indictments can be plausibly read as alleging: (1) the unnamed `others' in the New York [I]ndictment includes some of the named defendants in the present indictment; (2) the unnamed `others' in the present indictment include Gonzalez's co-defendant in the New York [I]ndictment; and/or (3) that the unnamed `others' in both indictments include some of the same persons, although they are not named in either indictment." Indeed, it appears that those associated with Gonzalez in the purchase of cocaine in New York were entirely distinct from those associated with Gonzalez in the extensive operations of the Estrada organization in Bridgeport and elsewhere.
 
 
 30
 3. The Overlap of Time. The New York Indictment deals with a cocaine conspiracy of less than a month's duration, while the Connecticut Indictment deals with a cocaine base conspiracy of five years' duration. The shorter and smaller conspiracy took place within the time period of the longer and greater conspiracy. Accordingly, we are not presented here with a situation implicating the disapproved process whereby the Government charges "smaller and smaller conspiracies, wholly contained within the scope of a large conspiracy, until it finds one small enough to be proved to the satisfaction of a jury." United States v. Calderone, 982 F.2d 42, 48 (2d Cir.1992). Here, Gonzalez participated in the larger conspiracy before, during and after he participated in the smaller, one-shot conspiracy. Finally, "where the smaller conspiracy is charged first [as here], there is not the same opportunity for prosecutorial abuse, and the overlap of time is therefore a less important consideration." Macchia I, 35 F.3d at 669.
 
 
 31
 4. Similarity of Operation. Although the District Court determined that "neither party has submitted any information concerning purported similarities or differences of operation between the two charged conspiracies," we agree with the Government that there is a clear difference between "the nature and the texture of the conspiracies charged in New York and the District of Connecticut." The operation in New York was one transaction in which Gonzalez sought to purchase a single quantity of cocaine. Although, as a matter of law, a conspiracy to possess with intent to distribute, the operation involved only a purchase of narcotics, albeit a substantial one. In contrast, operations in Connecticut were extensive and complex, involving as they did the preparation, packaging and distribution of drugs through a widespread network over an extended period of years. A large roster of personnel consisting of supervisors (lieutenants), runners and turf protectors was maintained by the organization. In New York, there were only two sellers, one middleman and a lookout, signifying a much different modus operandi from the one in Connecticut.
 
 
 32
 5. The Existence of Common Overt Acts. The District Court noted that "although the crime for which Gonzalez was charged in the two indictments does not require proof of an overt act, the Government has expressly stated its intent to use the facts underlying Gonzalez' guilty plea to the New York Indictment at Gonzalez' upcoming trial to establish his guilt in this action." According to the District Court, this expression of intent on the part of the Government "emphasizes the overlap between the conspiracies charged in Count 13 of the Connecticut Indictment and the New York Indictment." The District Court was correct in its determination that proof of overt acts was not necessary to establish guilt under either the New York or the Connecticut Indictment. See United States v. Chalarca, 95 F.3d 239, 245 (2d Cir.1996) (citing United States v. Shabani, 513 U.S. 10, 13-16, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994)). However, the overt act of purchasing cocaine in New York for possible conversion to crack cocaine to be distributed in Connecticut constituted the sole overlapping "overt act." There were many more "overt acts" committed in Connecticut, including, as noted by the Government, "the use of violence to secure the organization's drug turf, carrying and using firearms to enforce its control over the drug market, and the use of lookouts and numerous street level dealers or `runners' to distribute the processed narcotics."
 
 
 33
 6. The Geographic Scope of the Alleged Conspiracies or Location Where Overt Acts Occurred. Gonzalez' participation in the conspiracy that took place in New York was limited to his activities in Queens, New York, while his participation in the conspiracy that took place within Connecticut occurred in Bridgeport and other places in that State. His activities in Connecticut were manifold in his capacity as the first lieutenant in the Estrada organization. As a significant actor in the organization's drug trafficking business, he continued to perform his duties in the organization even after his arrest in New York. While it appears that he came to New York to buy heroin for the organization in Connecticut and ended up purchasing cocaine, there was a clear geographic separation. The Estrada organization simply was not involved in street level, retail distribution in New York. That activity was confined to the P.T. Barnum project in Bridgeport and other locations in Connecticut.
 
 
 34
 7. Common Objectives. The District Court found that "the sole purpose of the conspiracy charged in the New York Indictment was the purchase of cocaine for use in the broader conspiracy alleged in Count 13 of the Connecticut Indictment: the sale of cocaine base or `crack' in Connecticut. Those two conspiracies thus not only share common objectives, but are also, for the same reasons, completely interdependent." We disagree. The final objective of the New York conspiracy was to secure a wholesale quantity of unprocessed cocaine, and the agreement in New York was related only to that purpose and objective. Gonzalez' co-conspirators in New York were Cano-Lopez, Mota and the two informants. None of these was a party to any agreement entered into among the members of the Estrada organization to purchase, prepare, package or distribute narcotics. While it may be that the organization would have arranged to convert the cocaine purchased by Gonzalez into crack for distribution in Connecticut, there is no evidence that the New York co-conspirators were aware of that. The agreements of the New York co-conspirators were different from the agreements of the Connecticut co-conspirators, and "multiple agreements to commit separate crimes constitute multiple conspiracies." United States v. Broce, 488 U.S. 563, 571, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989).
 
 
 35
 8. The Degree of Interdependence Between Alleged Distinct Conspiracies. "This factor requires us to consider the extent to which the success or failure of one conspiracy is independent of a corresponding success for failure by the other." Macchia I, 35 F.3d at 671. Here, the success or failure of the Connecticut crack cocaine conspiracy was totally independent of the success of the New York cocaine conspiracy. The agreement among Gonzalez, Cano-Lopez, Mota and the two informants for the sale and purchase of cocaine was complete in and of itself. It was in no way dependent on the narcotics conspiracy in Connecticut that existed long before and continued long after the completed conspiracy in New York. Nor was the success of the Connecticut conspiracy involving the extensive distribution of crack cocaine dependent on the success or failure of the conspiracy charged in the New York Indictment. Indeed, Gonzalez' participation in one conspiracy was not at all dependent on his participation in the other. One conspiracy certainly could succeed without the other here. In fact, the objectives of the Connecticut conspiracy continued to be achieved after the objectives of the New York conspiracy were thwarted by the arrests of the conspirators.
 
 
 36
 Having found distinct conspiracies, we see no need to comment on the District Court's finding that Count Thirteen, although not distinct from the conspiracy charged in the New York Indictment, is saved "because the Government did not know, and could not reasonably have known, of the facts supporting the charges in Count 13 of the Connecticut Indictment at the time it charged Gonzalez in the New York Indictment." Nor do we deem it necessary to comment upon the viability of such a rule. See Macchia I, 35 F.3d at 672-73 (Newman, then-C.J., concurring).
 
 CONCLUSION
 
 37
 The order of the District Court is affirmed.